COUNCIL OF ORGANIZATIONS AND OTHERS FOR EDUCATION
ABOUT PAROCHIAID v GOVERNOR

Docket Nos. 180681, 181298, 181300. Submitted June 8, 1995, at Lansing.
Decided March 29, 1996, at 9:20 A.M. Leave to appeal sought.

The Council of Organizations and Others for Education About
Parochiaid and others brought an action in the Ingham Circuit
Court against the Governor, the Department of Treasury, and the
Department of Education, seeking to have 1993 PA 362 declared
unconstitutional and to enjoin public funding of academy schools
pursuant to that act. Subsequently, the Board of Education of
School District No. 3 Fractional of the Townships of Berlin and
Orange and the Noah Webster Academy were added as defendants,
and the Northlane Math and Science Academy, the New Branches
School, and Central Michigan University were permitted to inter-
vene as defendants. The court, William E. Collette, J., declared 1993
PA 362 unconstitutional on its face, finding that the act violated the
provisions of Const 1963, art 8, § 2 because academy schools were
not public schools eligible for state funding within the meaning of
§ 2 and that the act violated the provisions of Const 1963, art 8, § 3
because the act divested the State Board of Education of certain
previously granted authority to supervise public education and thus
infringed on the board's constitutional authority granted by § 3. The
court enjoined any funding of academy schools based on the provi-
sions of 1993 PA 362. The defendants and the intervening defend-
ants appealed.

The Court of Appeals *held:*

1. A provision in a constitution should be given the interpretation
that the great mass of people would give it. In construing the con-
stitutionality of a statute, a court must look to the statute's require-
ments rather than the manner in which the statute is administered.
The constitutionality of a statute must be tested by considering
what may be done under the provisions of the statute without
offending any express provision of the constitution.

2. Because 1993 PA 362 is silent concerning the initial method of
selecting the members of the boards of directors of academy
schools and because there is no provision requiring the public bod-
ies that authorize the charters of academy schools to appoint the

directors or supervise the election of those directors, an academy school could be chartered without being subject to any public control and thus be controlled by an essentially private entity. Absent the imposition of a statutory provision requiring public control of the selection of members of boards of directors of academy schools, academy schools created pursuant to 1993 PA 362 cannot be considered to be public schools within the meaning of Const 1963, art 8, § 2, and, accordingly, the trial court properly held that 1993 PA 362 was unconstitutional on its face and enjoined the funding of academy schools pursuant to that act.

Affirmed.

O'CONNELL, J., dissenting, stated that the decision of the trial court should be reversed because, even assuming that Const 1963, art 8, § 2 requires that a school be under the immediate control of a public body in order to be considered to be a public school eligible for state funding, the only facts before the trial court showed that the authorizing public body of the academy schools that were parties to this litigation had exercised and had retained by contract the power to continue to exercise substantial control not only with respect to the selection of members of the boards of directors of the academy schools, but also with respect to a wide range of activities relating to the administration of the educational programs at those schools. The majority mistakenly seeks to test the constitutionality of 1993 PA 362 on the basis of some possible theoretical set of circumstances that might occur rather than on the basis of the facts actually before the trial court.

CONSTITUTIONAL LAW — ACADEMY SCHOOLS — PUBLIC SCHOOLS — PUBLIC FUNDING.

1993 PA 362 is unconstitutional on its face because it seeks to provide public funding of academy schools without requiring that the authorizing public bodies exercise and retain adequate immediate public control over the selection of the members of the boards of directors of the academy schools chartered by such public bodies (Const 1963, art 8, § 2).

*White, Przybylowicz, Schneider & Baird, P.C.* (by *Arthur R. Przybylowicz, William F. Young,* and *Suzanne Krumholz Clark*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Deborah A. Devine* and

*R. John Wernet, Jr.,* Assistant Attorneys General, for the Governor and other state defendants.

*David A. Kallman,* for the Berlin Orange Board of Education and Noah Webster Academy.

*Dykema Gossett PLLC* (by *John B. Curcio, Richard D. McLellan,* and *Julia Goatley-Moreno*), for Northlane Math and Science Academy and Central Michigan University.

*Clary, Nantz, Wood, Hoffius, Rankin & Cooper* (by *John H. Gretzinger* and *Marshall W. Grate*), for New Branches School.
Amici Curiae:

*Alfred H. Hall,* Senate Majority Counsel, and *Anne M. Boomer,* Assistant Senate Majority Counsel, for Dick Posthumus.

*Mark H. Cousens,* for the Michigan Federation of Teachers and Related School Personnel.

Before: MARILYN KELLY, P.J., O'CONNELL and D. A. TEEPLE, JJ.*

MARILYN KELLY, P.J. Defendants appeal as of right from a circuit court decision finding 1993 PA 362 unconstitutional on its face and enjoining public funding of academy schools. We affirm.

The first academy schools act[1] became effective December 28, 1993. For reasons not explained by the parties, on January 14, 1994, the Legislature repealed

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] 1993 PA 284, MCL 380.501 *et seq.*; MSA 15.4501 *et seq.*

it and passed a second academy schools act,[2] giving it immediate effect.

Plaintiffs brought the instant lawsuit on August 30, 1994, before the disbursal of any funds under the act. The parties filed cross-motions for summary disposition pursuant to MCR 2.116(C)(8). The circuit court expedited the case in order to reach a decision before the first date when payments would be made to academy schools under the act.

In an opinion dated November 1, 1994, the circuit court found that the second act, 1993 PA 362, violated the Michigan Constitution. Const 1963, art 8, § 2. The court used the definition of "public school" set forth in an attorney general's opinion, OAG, 1989-1990, No 6581, p 105 (May 8, 1989). It found that academy schools were not public schools according to art 8, § 2 of the constitution, because they were not under the exclusive control of the state. *Traverse City School Dist v Attorney General*, 384 Mich 390; 185 NW2d 9 (1971).

The second academy schools act allowed a school academy to be run by a private board of directors. 1993 PA 362, § 502. It provided the authorizing body no means for selecting members of the board. Section 503. Therefore, the court concluded that academy schools were not public schools.

The circuit court also found that the second academy schools act violated the Michigan Constitution at Const 1963, art 8, § 3 by divesting the state board of education of its authority to supervise public education. The court employed principles of statutory con-

---

[2] 1993 PA 362, MCL 380.501 *et seq.*; MSA 15.4501 *et seq.*, the act was amended by 1994 PA 416. The amendments are not at issue in this appeal.

struction. It concluded that the differences between the second act and the first indicated a legislative intent to divest the state board of education of its authority to supervise academy schools.

We find that the circuit court correctly ruled that academy schools did not meet the requirements of the Michigan Constitution, art 8, § 2, to be considered public schools.

Article 8, § 2 provides:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.
>
> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, preelementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

Technical rules of statutory construction do not apply to the construction of a constitution. *McCulloch v Maryland*, 17 US 316, 407; 4 L Ed 579 (1819). The primary rule is the rule of common understanding. *Traverse City, supra* at 405. A provision should be given the interpretation that the great mass of people

would give it. The intent to be arrived at is that of the people. *Id.*

To clarify meaning, the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished may be considered. Whenever possible an interpretation that does not create constitutional invalidity is preferred to one that does. *Id.* at 406. The Court is not bound by the legislative interpretation of constitutional provisions, but must determine independently the meaning of constitutional terms. *Richardson v Secretary of State*, 381 Mich 304, 311; 160 NW2d 883 (1968). Decisions concerning the validity of legislation do not in all cases depend upon matters of fact. No substantial factual issues are involved where the validity of a statute depends only on the authoritative answer to a controverted question of constitutional construction. 1 Singer, Sutherland Statutory Construction (5th ed), § 2.06, p 32.

*Traverse City, supra,* interpreted the provision which is at issue here. The Court discussed the history leading to the amendment, which arose out of a reaction to legislation providing aid for private schools. In discussing shared time arrangements, the Court indicated that the performance of services must be under the immediate and ultimate control of public authorities to satisfy art 8, § 2:

> Shared time can be provided by a public school system only under conditions appropriate for a public school. This means that the ultimate and immediate control of the subject matter, the personnel and premises must be under the public school system authorities, and the courses open to all eligible to attend a public school. [384 Mich 415.]

The parties in this case have agreed with the attorney general's conclusion: a public school must be one which is under the exclusive control of the state and open to all children in the district. OAG, 1989-1990, No 6581, p 103 (May 8, 1989). They also agree that a public school must be free of sectarian instruction. In formulating this conclusion, the attorney general looked to the guiding principles of *Traverse City*, *supra*, and decisions of other states. The key issue presented here is whether academy schools are under the exclusive control of the state.

We agree with the circuit court's conclusion that the academy schools act does not place charter schools under the exclusive control of the state.

The principle impediment is that the act allows entities with a privately selected board of directors to control academy schools. In construing the constitutionality of a statute, we must look to the statute's requirements rather than the method by which the individual schools administer their programs. *Rassner v Federal Collateral Society, Inc*, 299 Mich 206, 217-218; 300 NW 45 (1941). A valid statute is not rendered unconstitutional based on its improper administration. *People v Kirby*, 440 Mich 485, 493; 487 NW2d 404 (1992). Similarly, an invalid statute is not saved by compensating actions on the part of its administrators. *Rassner, supra*. The constitutionality of a law must be tested by what may be done under it without offending any express provision of the constitution. *Cummings v Garner*, 213 Mich 408, 435; 182 NW 9 (1921). The Court must look through forms and behind labels into the substance of the law. The people have a right to have the limitations in a state constitution respected and given the fair and legitimate

force which its terms require. *Lockwood v Comm'r of Revenue*, 357 Mich 517, 557-558; 98 NW2d 753 (1959).

The second academy schools act is silent as to the initial method of selecting a board of directors. There is no provision requiring the public authorizing body to appoint the directors or monitor their election. We recognize that, through its charter contracts, intervening defendant Central Michigan University may retain the power to select the directors of the academy schools which it authorizes. However, nothing in the statute requires an authorizing body to implement such a requirement. We must determine the constitutionality of a statute based upon the things it affirmatively permits. *Rassner, supra*. We cannot assume that all authorizing bodies will take additional steps which the statute does not require. Contrary to the assertion of the dissent, it is the construction of the statute which is at issue, not the possible factual scenarios which different authorizing bodies may present.

Under the act, an academy school is organized by a board of directors following the nonprofit corporation act.[3] Section 502(1). This self-selected private board of directors then applies to an authorizing body, listing the proposed board members or a description of qualifications and a method for selection of the board. Section 502(3)(b). Only then does the authorizing body adopt a resolution establishing the method of selection, length of term and number of the board of directors of the academy school. Section 503(3).

An academy school is organized and administered by its board of directors. Although the authorizing

---

[3] 1982 PA 162, MCL 450.2101 *et seq.*; MSA 21.197(101) *et seq.*

body adopts the method of selecting the board, there is no requirement that the authorizing body select or approve the initial board of directors. Therefore an academy school may be run by an essentially private entity, outside the realm of public control. Because this conflicts with article 8, § 2 of the 1963 Michigan Constitution, the circuit court properly enjoined funding of academy schools under the second academy schools act.

The dissent places inordinate emphasis on technical rules of construction. The proper focus is on what the people meant by the term "public school." Defendants' argument that the framers of the constitution intended the Legislature to have free reign to define the system of public schools is negated by the adoption of the parochiaid amendment. When the people of our state added it, they placed a restriction on the Legislature's power.

> Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in main only undertake to lay down broad general principles, to a literal and technical construction. [*People ex rel Bay City v State Treasurer*, 23 Mich 499, 506 (1871).]

When unencumbered by inappropriate use of technical rules of construction, the task of this Court is clear. It is to decide whether the people, when adopting the parochiaid amendment, contemplated that a school organized by a private group of citizens could be considered a public school. In this case, the statute lacks a mechanism which mandates that a public

body select the board of directors for the school.[4] Thus, 1993 PA 362 does not meet the constitutional standard of Const 1963, art 8, § 2, limiting public funding to public schools within the common understanding of that term.

Having found that the circuit court properly entered its injunction on this ground, we need not reach the remaining issues.

Affirmed.

D. A. TEEPLE, J., concurred.

O'CONNELL, J. (*dissenting*). The wearing of judicial robes is not a license to usurp governmental powers confided to other branches, to take on the role of philosopher kings, or to act as counterweights to swing the balance of the political process. Pursuant to Const 1963, art 3, 2, the judiciary has no legislative powers, and, thus, it cannot act as a "super legislature" to sit in review of the policy choices made by coordinate branches of government acting within their respective spheres of authority. Today, the judiciary, once again, has overstepped its proper constitutional role, fancying itself a Solon rather than a Solomon. The majority has effectively rendered the elected representatives of our state supernumeraries.

I

The primary shortcoming of the majority opinion is its adoption of a standard of review that is exactly wrong. The majority today declares that "[t]he constitutionality of a law must be tested by what may be

---

[4] The Court does not reach the question of whether school board members must be elected, as that issue was not presented by the parties.

done under it," *ante*, p 132, meaning that if a legislative enactment is conceivably subject to unconstitutional application, it must be struck down as unconstitutional. Holding in abeyance the question of what, if any, law would pass such a test, I would simply state what any student of the law already knows— where a party challenges the facial constitutionality of an act, which plaintiffs have done with respect to 1993 PA 362, the party "must establish that *no set of circumstances exist under which the [a]ct would be valid.* The fact that the . . . [a]ct *might* operate unconstitutionally under some conceivable set of circumstances is insufficient." *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987) (emphasis supplied).

Precedent demands that this Court apply a standard of constitutional review diametrically opposed to that today contrived by the majority. "This 'it-is-so-because-we-say-so' jurisprudence constitutes nothing more than an attempted exercise of brute force; reason, much less persuasion, has no place." Lind, *Constitutional Adjudication as a Craft-Bound Excellence*, 6 Yale J Law & The Humanities 353, 369-370, n 105 (1994), quoting *Webster v Reproductive Health Services*, 492 US 490, 552; 109 S Ct 3040; 106 L Ed 2d 410 (1989) (Blackmun, J., dissenting). Nevertheless, in what I can only characterize as an impassioned eagerness to strike down the legislative act in issue, the majority has concocted an unscalable constitutional barrier to legislation and, unsurprisingly, found the legislation unable to surmount that barrier.

Second, in so doing, the majority has encroached on the sphere of authority reserved to our Legislature, thereby violating the doctrine of separation of pow-

ers. Our constitution provides that "[n]o person exercising powers of one branch [of government] shall exercise powers properly belonging to another branch." Const 1963, art 3, § 2. The constitutional provision upon which the majority relies to strike down 1993 PA 362, Const 1963, art 8, § 2, states that the Legislature shall support a system of free public schools as defined by law. At the risk of belaboring the obvious, clearly, it is the Legislature's task to define that system of public schools. Despite this, the majority not only usurps the prerogative that our constitution grants the Legislature in this context, but also then proceeds to strike down the Legislature's definition of public school because that definition does not comport with the majority's definition.

Third, the majority's definition of the term "public school" as used in Const 1963, art 8, § 2, contradicts not only Supreme Court precedent, but also the very words of the framers of our constitution. The majority asserts that the essential element of a public school lacking in 1993 PA 362 is a "provision requiring the public authorizing body to appoint the directors or monitor their election." *Ante,* p 132. However, the Supreme Court has stated:

> The authority granted by the Constitution to the Legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school-districts, to define their powers and duties, their terms of office, *and how and by whom they should be chosen.* [*Belles v Burr,* 76 Mich 1, 11; 43 NW 24 (1889) (emphasis supplied).]

Further, the framers of our constitution stated that "restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are

better left to legislative determination." 2 Official
Record, Constitutional Convention 1961, p 3395.

One might reasonably inquire of the majority, in
light of the above, from where it derives its ostensible
requirement that authorizing bodies directly appoint
the directors of public school academies or that the
bodies monitor their election. The basket in which
the majority puts all its eggs is *Traverse City School
Dist v Attorney General*, 384 Mich 390; 185 NW2d 9
(1971). However, our Supreme Court has made clear
that the *Traverse City* "decision was based solely on
federal constitutional law," *Snyder v Charlotte Public
School Dist*, 421 Mich 517, 533; 365 NW2d 151 (1984),
not on our state constitution. In any event, *Traverse
City* says absolutely nothing concerning the manner
in which the members of the school boards are to be
installed or concerning anything remotely related to
the subject. If one reads carefully the majority opin-
ion, one will discover that the majority supports its
convictions concerning the board of directors of pub-
lic school academies with the same Barmecidal
authority it uses to support its innovative standard of
review.

As clearly set forth in our constitution, it is the
responsibility of the Legislature to define Michigan's
system of free public schools. The majority avers that
when "unencumbered" by the impediment" of "inap-
propriate" rules of construction, its task becomes
"clear." *Ante*, p 134. However, the *task* of this Court
was clear when a claim of appeal was filed—to
resolve the dispute in accordance with the law. Only
the *outcome* of the appeal becomes clear after slough-
ing off the encumbrance of a venerated standard of
constitutional review, after jettisoning the impedi-

ment of established precedent. Unlike the majority
and its innovative approach to constitutional review, I
would find no conflict between 1993 PA 362 and our
constitution. A complete analysis of 1993 PA 362
follows.

II

The public school academy act, 1993 PA 362[1] (here-
inafter the act) provides for the establishment of
"public school academies," commonly referred to as
"charter schools." The act provides that public school
academies are both public schools within the mean-
ing of Const 1963, art 8, § 2 and school districts for
purposes of Const 1963, art 9, § 11. 1993 PA 362,
§ 501(1). Accordingly, the act provides for the funding
of public school academies in the manner of other
public schools. Section 507. Public school academies
may not charge tuition. Section 504(2). They may not
discriminate in their admissions policies on the basis
of intellectual ability, assessments of aptitude, or edu-
cational achievement or on any basis that would be
illegal if used by any other public school district,
§ 504(2), such as race or religion. Const 1963, art 8,
§ 2. Further, the act expressly provides that public
school academies are subject to all federal and state
constitutional provisions pertaining to religious entan-
glement. Section 502(1).

---

[1] Since the trial court's decision, the Legislature has amended the
School Code by enacting 1994 PA 416, an act also providing for the estab-
lishment of public school academies. This new act was intended to satisfy
the specific constitutional objections identified by the trial court. How-
ever, its passage does not render the present appeal moot. 1994 PA 416
provides that its provisions are repealed if the present appeal results in a
judicial determination that the prior provisions, as set forth in 1993 PA
362, are "constitutional, effective, or otherwise valid." Section 518 of the
School Code, MCL 380.518; MSA 15.4518, as added by 1994 PA 416.

Before the creation of each public school academy, its curriculum and educational goals must be approved by an "authorizing" body—the board of a school district or intermediate school district, the board of a community college, or the board of a public university. Subsections 2 and 3(d)(ii) of § 502. Public school academies may use instructional methods utilized by other public schools, but may also implement innovative teaching techniques, subject to the general supervision of the State Board of Education and to the oversight of each school's respective authorizing body. Section 505(2). Pupil progress is evaluated through administration of state-sanctioned assessment tests, such as the Michigan education assessment program (MEAP) test. Section 502(3)(d)(ii). If a public school academy should fail to meet its educational goals as approved by its authorizing body, the "charter" authorizing its creation and funding may be revoked by its authorizing body. Section 507(a). Various other grounds for revocation of the agreement establishing a public school academy also exist, such as the failure to comply with applicable law and the failure to abide by generally accepted public sector accounting principles. Subsections b and c of § 507.

Public school academies are required to use certified teachers in all circumstances in which other public schools are required to use certified teachers, except in limited situations involving established university or community college faculty. Section 505. Where relevant, public school academies must provide an assurance to their respective authorizing bodies "that employees of the public school academies will be covered by the collective bargaining agree-

ments that apply to other employees of the school
district employed in similar classifications in schools
that are not public school academies." Section
502(3)(h).

Each public school academy is established by a
process that begins with an application to an author-
izing body. The inchoate public school academy sub-
mits to the authorizing body proposed articles of non-
profit incorporation, § 502(3)(c), and documentation
pertaining to the proposed curriculum, educational
goals, the age or grade level of the prospective stu-
dents, the name of the public school academy, and a
list of the proposed members of the public school
academy's initial board. Section 502(3). The authoriz-
ing body, upon submission of the required informa-
tion, may or may not issue a contract to establish the
proposed public school academy. Section 503(1). If,
after considering any competing proposed public
school academies, the authorizing body elects to
authorize the organization of the particular public
school academy, the authorizing body is required to
"adopt a resolution establishing the method of selec-
tion, length of term, and number of members of the
board." Section 503(3).

Public school academies are maintained by public
funds. Section 507. State school aid payments, calcu-
lated on a per capita basis, are paid to the authorizing
body of each particular public school academy, which
then forwards the payment to the public school acad-
emy. As stated above, the authorizing body that is
charged with overseeing the public school academy's
compliance with all statutory and contractual require-
ments may revoke the contract should the public
school academy fail to satisfy these requirements. *Id.*

On August 30, 1994, before the disbursal of any funds under the act, plaintiffs filed suit, failing to name any particular public school academy as a defendant. Plaintiffs soon after amended their complaint to add Noah Webster Academy. Northlane Math and Science Academy and New Branches School, among others, later intervened as parties defendant.

Plaintiffs alleged that the act violated three provisions of the 1963 Michigan Constitution. Plaintiffs contended, first, that the act violated Const 1963, art 8, § 2 by providing for the funding of schools that were not, in fact, public because they were not sufficiently under the control of the state. Const 1963, art 8, § 2 provides as follows:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.
>
> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, preelementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

Second, plaintiffs argued that the act violates Const 1963, art 8, § 3 because it allegedly divests the State

Board of Education of its duty to lead and exercise general supervision over public education. Const 1963, art 8, § 3 provides as follows:

> Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.

Third, plaintiffs alleged that the act violates Const 1963, art 9, § 11, because it purportedly allows public academy schools, which are, necessarily, nonprofit corporations, to assess taxes. Const 1963, art 9, § 11 provides as follows:

> There shall be established a state school aid fund which shall be used exclusively for aid to school districts, higher education and school employees' retirement systems, as provided by law. One-half of all taxes imposed on retailers on taxable sales at retail of tangible personal property, and other tax revenues provided by law, shall be dedicated to this fund. Payments from this fund shall be made in full on a scheduled basis, as provided by law.

In an opinion dated November 1, 1994, the circuit court ruled that 1993 PA 362 violates the Michigan Constitution in two ways. First, the circuit court found that Const 1963, art 8, § 2 is violated because public school academies are not "public schools" as that term is used in our constitution where they are not sufficiently subject to public control. In reaching this conclusion, the court relied primarily upon OAG, 1989-1990, No 6581, p 103 (May 8, 1989) but also found support in *Traverse City School Dist v Attor-*

*ney General, supra.* Combining the most restrictive terms found in each of these sources, the court pronounced: "This Court determines that a school must be under the *immediate, exclusive control of the state* to pass constitutional muster, as well as being open to all students that care to attend." The court then examined the act and reasoned that, because it would be possible for an authorizing body to grant a charter that did not satisfy its "immediate, exclusive control" requirement, the act was in violation of Const 1963, art 8, § 2. Notably, the circuit court's opinion made no mention of the particular facts of the present case, failing even to mention any of the defendants.

Second, the circuit court found that 1993 PA 362 usurped the power of the State Board of Education to exercise general supervision over public education in Michigan. Comparing the act in issue to a predecessor act, 1993 PA 284, the court noted differences between the two and inferred that the differences "clearly indicate that the legislature intended to take away the authority of the State Board of Education in the passage of 1993 PA 362." Accordingly, the circuit court enjoined public funding of public school academies.

With respect to the challenge predicated on Const 1963, art 9, § 11, the trial court stated it was "unable to find precedent to support" this assertion by plaintiffs and concluded that it would "decline to address this question, except to say that as a general rule enactments of the legislature are presumed valid. Therefore, there being no precedent in support of plaintiffs on this issue, this Court will presume the

law valid on this point."[2] Plaintiffs have not cross
appealed this issue, so we need not address it. Addi-
tionally, because this issue was not briefed on appeal,
it is considered abandoned. *Anchor Bay Concerned
Citizens v Anchor Bay Bd of Ed*, 55 Mich App 428,
431; 223 NW2d 3 (1974).

III

At issue in the present case, then, is whether 1993
PA 362 violates Const 1963, art 8, § 2, through the
allocation of public funds to schools that are not suf-
ficiently under public control to be considered "public
schools," or Const 1963, art 8, § 3, by divesting the
State Board of Education of its duty to exercise
"[l]eadership and general supervision over all public
education."

With respect to Const 1963, art 8, § 2, the Legisla-
ture has declared public school academies to be pub-
lic schools. Section 501(1). However, this does not
answer the question. The courts are not bound by leg-
islative interpretations of constitutional provisions,
but must determine independently the meaning of
constitutional terms "without benefit of legislative
construction." *Richardson v Secretary of State*, 381
Mich 304, 311; 160 NW2d 883 (1968); see also *Durant
v State Bd of Ed*, 424 Mich 364, 392; 381 NW2d 662
(1985).[3]

---

[2] The School Code of 1976, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has
since been amended to clarify that "[a] public school academy may not
levy ad valorem property taxes or any other tax for any purpose." 1994 PA
416, § 503(8).

[3] The School Code of 1976, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has
since been amended to define expressly the term "public school" so as to
encompass public school academies. 1994 PA 416, § 5(6). This Court may
not consider this amendment not only because it postdates the circuit

At the outset, I would note that the parties and the lower court seek sweeping constitutional pronouncements in this case sufficient to answer any questions one may have concerning public school academies and the constitutional provisions in issue. This Court has been deluged with Latin and inundated with esoteric rules of law as we have waded through the thousands of pages of documents pertaining to this case.

While I intend no slight to the scholarship of the parties, it appears that some of the more general rules of constitutional interpretation have been overlooked. For example, it is only when absolutely unavoidable that the courts will decide questions of a constitutional nature. *People v Stafford*, 434 Mich 125, 132, n 3; 450 NW2d 559 (1990). When the validity of an act of the Legislature is drawn into question, even if a serious doubt of constitutionality is raised, it is a cardinal principle that a court must first ascertain whether a construction of the statute is fairly possible by which the question of an act's constitutionality may be avoided. *People v Cavaiani*, 172 Mich App 706, 714; 432 NW2d 409 (1988).

When compelled to make a constitutional pronouncement, the court must do so with great circumspection and trepidation, with language carefully tailored to be no broader than that demanded by the particular facts of the case rendering such a pronouncement necessary. *United States v Raines*, 362 US 17, 21; 80 S Ct 519; 4 L Ed 2d 524 (1960). More specifically, and as deftly summarized by our

court ruling, but also because this Court must independently determine the meaning of constitutional terms.

Supreme Court in *General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940):

> The court will not go out of its way to test the operation of a law under every conceivable set of circumstances. The court can only determine the validity of an act in the light of the facts before it. Constitutional questions are not to be dealt with in the abstract.

Accord *Regents of Univ of Michigan v Michigan*, 395 Mich 52; 235 NW2d 1 (1975); *United States v Salerno*, *supra*, 481 US 745. This is but a specific application of the general rule that "if any state of facts reasonably can be conceived that would sustain [a legislative act], the existence of the state of facts at the time the law was enacted *must* be assumed." 16 Am Jur 2d, Constitutional Law, § 218, p 642 (emphasis supplied). Further, "[a] statute may be constitutional though it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements, and in this situation the court is justified in holding that the statute was intended to be subject to such requirements, and that those requirements are to be considered as embodied in the statute." *Id.*, § 225, p 659.

IV

With respect to Const 1963, art 8, § 2, no binding authority has as yet determined the essential elements of a public school.[4] Plaintiffs have brought

---

[4] The 1963 Michigan Constitution does not attempt to define "public schools." The language of Const 1963, art 8, § 2 implies that in 1962, the people of Michigan intended to delegate to the Legislature the responsibility of defining the form and institutional structure through which public education is delivered in Michigan: "The legislature shall maintain and support a system of free public elementary and secondary schools *as*

various arguments designed to demonstrate that the public school academy act is unconstitutional because, under the language of the act, it is conceivable that public school academies could be established that are not subject to the immediate and exclusive control of the state. Obviously, the keystone of this position is the issue of control. Plaintiffs urge that this Court adopt the definition of "public school" adopted by the circuit court (characterized by its "immediate, exclusive control" requirement) and conclude that public school academies fail to satisfy the definition. To do so, this Court would have to find that the term "public school" as used in our constitution implies as an essential element that public schools must be under the "immediate, exclusive control" of the state.[5] In light of this Court's traditional reticence to handcuff future jurists through the utterance of imprudent and unnecessary constitutional

_defined by law._" (Emphasis added.) This notion is echoed in the Convention Comments to the provision, where it is stated that "restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are better left to legislative determination." 2 Official Record, Constitutional Convention 1961, p 3395.

[5] The majority seems satisfied that defendants do not contest the definition of public school advanced by plaintiffs, one originally found in a nonbinding opinion of the Attorney General, and unquestioningly applies that definition. However, the courts may not properly strike down acts of the Legislature "on the strength of stipulations signed by agreeable litigants." _Rozankovich v Kalamazoo Spring Corp (On Rehearing),_ 44 Mich App 426, 428; 205 NW2d 311 (1973).

Additionally, the Michigan Federation of Teachers and School-Related Personnel in its amicus brief correctly points out that in _Traverse City,_ the Supreme Court "never expressly defined 'public' schools as being under the control of 'public school authorities,' " and that the opinion referred only to local school boards as "authorities" and said nothing about the distinction between public and private schools.

interpretations, I would decline to adopt the definition of "public school" embraced by the circuit court.[6]

---

[6] I would further note that, were it necessary to define the term "public school" and were I persuaded that one of the necessary characteristics of a public school is that it be under the immediate and exclusive control of the state, it would not be for the reasons advanced by plaintiffs and embraced by the circuit court.

The circuit court formulated its control requirement by combining terms found in OAG, 1989-1990, No 6581, p 105 (May 8, 1989) with terms found in *Traverse City, supra.* In opinion No 6581, the Attorney General opined that the school there in question was not a public school because it "is not one under the exclusive control of the State of Michigan and it is not generally open to all children in the school district in which it is located." In *Traverse City,* the Supreme Court stated that, for a shared-time arrangement between a public and an admittedly private school to withstand constitutional scrutiny, the sharing arrangement must be under the "ultimate and immediate" control of public school system authorities.

First, I would not find the reasoning of the Attorney General to be persuasive and, accordingly, would decline to adopt it as my own. *Ludington & N R Co v Epworth Assembly,* 188 Mich App 25, 40; 468 NW2d 884 (1991). The Attorney General's exclusivity requirement finds it genesis not in a discussion of Const 1963 or in any discussion of Michigan law, but in a solitary 1945 decision of the Connecticut Supreme Court, *New Haven v Town of Torrington,* 132 Conn 194; 43 A2d 455 (1945), overruled in part *Anderson v Bridgeport,* 134 Conn 260; 56 A2d 650 (1947). In the *New Haven* case, the court ultimately concluded that a school was a public school entitled to public funding despite the fact that all of its students were Roman Catholic, eight of its ten teachers were nuns who wore their religious habits when teaching, the nuns conducted religious services in the classrooms in the morning before school and after each meal, and the school was located in and operated by the St. Francis Orphan Asylum, a diocesan corporation whose president was the Roman Catholic bishop of the Hartford Diocese. I would not find the reasoning of such an opinion to be overly persuasive.

However, my review of the trial court opinion would be greatly simplified were I to adopt the *New Haven* court's exclusivity standard, the import of which was apparently misapprehended by the Attorney General, the circuit court, and the majority. While the term "exclusive" has rather expansive connotations, connotations seized upon by the circuit court, as used in *New Haven, supra,* p 198, the word meant simply "compli[ant] in all respects [with] the laws of the state." Clearly, if this is the meaning of exclusive control, the Legislature would have little difficulty satisfying this standard because, by definition, any schools created by legislative act would be subject to the "exclusive" control of the state as long as the schools acted lawfully. Constitutional challenges under such a standard would be rejected as ludicrous.

Second, I would not find the language used in the *Traverse City* decision to be applicable to the present case. As stated in *Snyder v Charlotte Public School Dist, supra,* 421 Mich 533, and as is apparent from a thorough reading of the *Traverse City* opinion, the *Traverse City* "decision was based solely on federal constitutional law." Obviously, passing references to state constitutional law in a decision based solely on federal constitutional law are dicta and, accordingly, are not binding. More significantly, the *Traverse City* decision was not directly concerned with the definition of a public school. Its focus was directed toward shared-time arrangements with private schools, not on the definition of a public school.

Further, to adopt the dicta contained in *Traverse City* as law is contrary to fundamental notions of the role of the courts in conducting constitutional interpretation. To quote from *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82, 93; 180 NW2d 265 (1970), which was decided by our Supreme Court in the same session in which *Traverse City* was decided:

> We should heed well, prior to embarking on any constitutional interpretation, the advice most recently expressed by Mr. Chief Justice Burger in *Walz v Tax Commission of the City of New York,* 397 US 664 [90 S Ct 1409; 25 L Ed 2d 697 (1970)], that it is a Constitution we are expounding and we must, therefore, judiciously refrain from relying upon sweeping utterances from other cases which may be appropriate to those cases but have limited meaning as general principles.

Therefore, I would not consider it appropriate to rely upon a "sweeping utterance" contained in an opinion in which the definition of the term "public school" as used in Const 1963, art 8, § 2 was not in issue and which was decided solely on federal constitutional grounds.

Were I as eager to leave my imprimatur on Michigan constitutional law as is the majority, I would apply the only binding authority of which this Court is aware. *Boyd v W G Wade Shows,* 443 Mich 515, 523; 505 NW2d 544 (1993). In *Richter v Cordes,* 100 Mich 278; 58 NW 1110 (1894), the parties disputed whether a certain building that had been used as a school properly belonged to the school district or to the adjoining church. The state of the deed was unclear. Despite the fact that overtly religious instruction had been given in the school, the Supreme Court ruled that the fact that the school had received public funding necessarily meant that the school was public. *Id.,* p 285. Therefore, if any true touchstone exists when determining whether a school is, in fact, a public school, Supreme Court precedent dictates that that touchstone is the school's source of funding.

However, to reiterate, I would find it unnecessary to reach the constitutional question of the definition of a public school.

Rather, under the facts appearing in the record, it is unnecessary to determine whether a school must be under the immediate and exclusive control of the state to be considered to be a public school within the meaning of Const 1963, art 8, § 2. I would qualify this statement by clarifying that it is not altogether apparent that the state must exercise control over public schools beyond funding them, there existing no language in our Constitution expressly mandating that the state exercise such control. However, assuming arguendo that to qualify as a public school eligible for public funding under Const 1963, art 8, § 2 an educational institution must be under the immediate and exclusive control of the state, I do not think reasonable minds could differ but that the record before this Court, *General Motors, supra,* reflects no public school academy that is not subject to this pervasive degree of control.

As stated above, a court will "only determine the validity of an act in the light of the facts before it." *General Motors, supra,* 294 Mich 568.[7] Rather surprisingly, the record contains little information concern-

---

[7] The majority contends that when determining whether a statute is constitutional, "we must look to the statute's requirements rather than the method by which the individual schools administer their programs." *Ante,* p 132. The majority submits that *Rassner v Federal Collateral Society, Inc,* 299 Mich 206, 217-218; 300 NW 45 (1941), stands for the proposition. The Supreme Court would, no doubt, be interested in this interpretation of *Rassner.* Recently, the Court summarized the case as follows: "A valid statute is not rendered unconstitutional solely because those charged with its administration may improperly administer it. *Rassner v Federal Collateral Society, [Inc,]* 299 Mich 206; 300 NW 45 (1941)." *People v Kirby,* 440 Mich 485, 493; 487 NW2d 404 (1992). Clearly, *Rassner* says nothing of when a statute *is* rendered unconstitutional. The majority has committed a variation of a classic logical fallacy, the fallacy of the negative premise. See Aldisert, *Logic for Lawyers* (New York: Clark Boardman Company, Ltd, 1989), pp 156-159.

ing the only public school academy named as a defendant by plaintiffs, Noah Webster Academy. The record appears to lack the school's authorizing contract, articles of incorporation, bylaws, fiscal agent agreement, oversight agreement, and any of the other pertinent documentation necessary to a determination of the degree of control to which defendant Noah Webster Academy is subject. Therefore, because the court will not entertain constitutional questions predicated upon inadequate factual records, *Taunt v Moegle*, 344 Mich 683, 686; 75 NW2d 48 (1956), the constitutionality of 1993 PA 362 is not properly addressed in the context of defendant Noah Webster Academy.

However, the record contains extensive documentation pertaining to intervening defendants Northlane Math and Science Academy and New Branches School. Northlane's authorizing contract is two single-spaced pages, as is New Branches'. Northlane is also subject to twenty-one single-spaced pages of "Additional Terms and Conditions of Contract," and New Branches is subject to twenty single-spaced pages of additional conditions. I have also reviewed Northlane's and New Branches' articles of incorporation, which are six and seven pages in length, respectively. Northlane's bylaws, with appendices, are sixty-five single-spaced pages, and New Branches' are sixty-seven single-spaced pages. Northlane's fiscal agent agreement, oversight agreement, and schedule of staff responsibilities are, in aggregate, eighteen single-spaced pages; New Branches' parallel documents are twenty single-spaced pages. Additionally, the record contains several other documents containing restrictions to which each defendant public school academy is subject.

Both Northlane and New Branches have had to detail to the level of almost mind-numbing minutiae their respective curricula, teaching philosophies, staff responsibilities, and bookkeeping, auditing, and fiscal management policies. Whether existing public schools are uniformly subjected to this degree of micromanagement by their school boards may be open to question, but what is beyond question on this record is that, as actually organized, both Northlane and New Branches are subject to the exceedingly pervasive authority of their authorizing body, intervening defendant Central Michigan University. Because Central Michigan University is an agency of the state, Const 1963, art 8, § 4, both of these defendants are subject to the immediate, exclusive control of the state that I have assumed to exist for purposes of this discussion.

With respect to the assumed immediacy requirement, charter revocation proceedings may be initiated with respect to both Northlane and New Branches at any time the authorizing body has a reasonable belief that grounds for revocation exist, such as either academy's failure to abide by the terms of its charter. Further, Central Michigan University has the right to demand periodic reports from the public school academies "regarding any aspect of [their] operations," and the public school academies must "permit inspection of the [respective] Academy's records and/or premises at any time." Because the authorizing body has complete discretion to reject the charter when initially proposed and the right to commence immediately revocation proceedings if the charter is violated, I would conclude that the defendant public school

academies are subject to the immediate control of their authorizing body.

With respect to the assumed exclusivity requirement, no public school academy may be established without the authorization of an authorizing body. Both the particular authorizing body in the present case, intervening defendant Central Michigan University, and authorizing bodies generally under 1993 PA 362, have the right to reject outright, *for any reason,* the applications of proposed public school academies. If this is not exclusive control, control surpassing even that exercised over traditional public schools, it is difficult to conceive of what exclusive control entails. In short, the state exercises exclusive control over public school academies through the application approval process, in which an authorizing body can reject any application with which it is not completely satisfied in any detail, and through the authorizing body's right to revoke the charter of any public school academy that does not comply with its charter.

It is not necessary in this case to construe 1993 PA 362 as mandating retention of any or all of the forms of control discussed above. No doubt, differing mechanisms may be devised granting authorizing bodies similar degrees of control. I would hold only that, from what exists on this record, public school academies are subject to omnipresent control by the state sufficient to satisfy even the immediate and exclusive standard that I have assumed to be an essential element of public schools.

Although unnecessary to the resolution of plaintiffs' challenge of 1993 PA 362 in the context of Const 1963, art 8, § 2, I would digress briefly to address one of the themes that has recurred in this litigation.

Plaintiffs repeatedly direct this Court's attention to the fact that the initial board of a public school academy is not chosen by its authorizing body, but is merely approved by its authorizing body. It is contended that such a procedure, either in and of itself or in combination with other characteristics of public school academies, wrests control of public school academies from the public. Specifically, plaintiffs contend that both the authorizing board and the public school academy board must be publicly elected.

Several shortcomings undermine this argument. Preeminent among these is the absence of any mention in our constitution of the manner in which school boards are to be chosen. This Court will not declare an act of our Legislature to be unconstitutional unless there exists a "clearly apparent" conflict between the legislation and the constitution. *Derrick v Detroit*, 168 Mich App 560, 563; 425 NW2d 154 (1988). It is difficult to recognize a clearly apparent conflict where our constitution contains no mention of the contested subject matter.

Further, our Supreme Court has stated that "[t]he authority granted by the Constitution to the Legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school districts, to define their powers and duties, their terms of office, *and how and by whom they should be chosen*." *Belles v Burr*, 76 Mich 1, 11; 43 NW 24 (emphasis supplied) (1889). While our constitution has changed since the Supreme Court decided *Belles*, this principle of law has not, because *Belles* was followed by this Court in *Penn School Dist No 7 v Lewis Cass Intermediate School Dist Bd of Ed*, 14 Mich App

109, 125-126; 165 NW2d 464 (1968). Further, the framers of our constitution stated that "restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are better left to legislative determination." 2 Official Record, Constitutional Convention 1961, p 3395. Therefore, again, assuming that a public school must be subject to the immediate and exclusive control of the state, I would find no support for the proposition that publicly elected boards are a constitutional component of such control. Similarly, this authority undermines the majority's position that 1993 PA 362 must contain a "provision requiring the public authorizing body to appoint the directors or monitor their election," *ante*, p 132, a position that the majority holds without benefit of authority.

However, to dispense with the suggestion that private entities are given carte blanche to appoint to the boards of public school academies whomever they choose, the public school academy act clearly requires that all initial public school academy board members be approved by their authorizing bodies. Sections 502(3)(b), 503(1). No initial board member, therefore, will sit on a board without receiving the prior approval of the appropriate authorizing body. In the present case, both Northlane and New Branches submitted lists of proposed, named initial board members to Central Michigan University, each of which contained both parents of prospective students and professional educators. These proposed members were subject to the personal evaluation and approval of the Central Michigan University Board of Trustees. Had Central Michigan University, a state agency, been

dissatisfied with any of the proposed members, it would have rejected the application.

Further, in the present case, the authorizing body of Northlane and New Branches, intervening defendant Central Michigan University, has retained the authority "to disapprove a proposed [subsequent] member [of the board] at its next regular meeting." Thus, even if immediate and exclusive control were required in the context of board member installation, the right to disapprove of all proposed board members, both initial and subsequent, is sufficient to satisfy this requirement.[8]

In summary, I would decline to reach the issue whether the term "public schools" as used in Const

---

[8] It should also be noted that public school academy board members are public officials and are subject to all applicable law pertaining to public officials. The issue of who is and who is not a public official was discussed in *Banfield v Wood*, 104 Mich App 279, 282; 304 NW2d 551 (1981), quoting *People v Freeland*, 308 Mich 449, 457-458; 14 NW2d 62 (1944):

> "After an exhaustive examination of the authorities, we hold that five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional."

Applying this definition to public school academy board members, it is clear they are public officials. Furthermore, nothing in 1993 PA 362 defines this board as "private." Only the majority opinion adopts the term "private board of directors", *ante*, p 129, in order to achieve its desired result.

1963, art 8, § 2 necessarily includes an element of state control. However, assuming arguendo that the state must exercise some degree of control over educational institutions for them properly to be considered to be public schools, and further assuming that the appropriate degree of control is the immediate and exclusive standard advanced by plaintiffs and adopted by the circuit court, I would find in light of the record evidence that both defendant Northlane Math and Science Academy and defendant New Branches School are subject to this degree of state control. Therefore, if such a constitutional requirement exists, it is satisfied under the facts of the present case.

V

Plaintiffs also argue that the public school academy act divests the State Board of Education of its constitutional authority to exercise "leadership and general supervision" over public education.[9] Const 1963, art 8, § 3. This contention does not warrant the extended treatment that was required in my discussion of Const 1963, art 8, § 2.

The circuit court, in concluding that the public school academy act divests the State Board of Education of its constitutional authority, relied primarily on a comparison of 1993 PA 362 with the act it repealed, 1993 PA 284. The circuit court reasoned that because the prior act included specific references to the

---

[9] The School Code of 1976, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has since been amended to make explicit that public school academies are "subject to the leadership and general supervision of the state board [of education] over all public education under section 3 of article VIII of the state constitution of 1963." 1994 PA 416, § 501(1).

authority of the State Board of Education over public school academies—references omitted in the latter act—the Legislature was motivated by a desire "to take away the authority of the State Board of Education in the passage of 1993 PA 362 and place such control in the hands of local authorities."

Although legislative motive would in any event be irrelevant,[10] 1993 PA 362 does not conflict with Const 1963, art 8, § 3. Because public school academies are declared to be public schools, § 501(1), they are necessarily subject to the leadership and general supervision of the State Board of Education to the same extent as are all other public schools. Further, § 503(5) of the act states that a public school academy shall comply with all applicable law, a requirement that incorporates the constitutional provision in issue. As stated in 16 Am Jur 2d, Constitutional Law, § 225, p 659: "A statute may be constitutional though it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements."

Additionally, 1993 PA 362 does not exist in a vacuum; the authority of the state board over public

---

[10] As iterated in *Kuhn v Dep't of Treasury*, 384 Mich 378, 383-384; 183 NW2d 796 (1971), quoting *C F Smith Co v Fitzgerald*, 270 Mich 659, 681; 259 NW 352 (1935), in turn quoting *People v Gibbs*, 186 Mich 127, 134; 152 NW 1053 (1915):

> " 'Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law but only in the results of their actions. Bad motives might inspire a law which appeared on its face and proves to be valid and beneficial, while a bad and invalid law might be and sometimes is passed with good intent and the best of motives.' "

Therefore, it was no more appropriate for the circuit court to consider the motives of the Legislature than it would be for one to consider the motives of the circuit court or the majority.

schools is established by other statutes. The state board implementing statute, MCL 388.1009; MSA 15.1023(9), states that the board has powers of supervision over all public education. MCL 388.1015; MSA 15.1023(15), provides the board with the authorization to prescribe rules and regulations that it deems necessary to carry out the provisions of the act.

Thus, despite the deletion of explicit references to the provisions of the School Code regarding the duties of the state board, it is clear that the board retains its constitutional authority over public school academies. As noted in *State Bd of Ed v Houghton Lake Community Schools*, 430 Mich 658; 425 NW2d 80 (1988), the principal means by which the state board exercises its powers over all school districts is through the State School Aid Act. See MCL 388.1603(5); MSA 15.1919(903)(5). The board retains this power over public school academies. There is no obligation on the part of the Legislature to restate in 1993 PA 362 what is already contained elsewhere in the law. Therefore, I would find no "readily apparent" conflict between the act and our constitution. *Derrick v Detroit, supra,* 168 Mich 563.

I would reverse and dissolve the injunction issued by the circuit court.