COUNCIL OF ORGANIZATIONS AND OTHERS FOR EDUCATION
ABOUT PAROCHIAID, INC v GOVERNOR

Docket Nos. 106092-106094, 106106-106111. Argued March 5, 1997 (Calendar No. 13). Decided July 30, 1997.

The Council of Organizations and Others for Education About Parochiaid, Inc., and others, brought an action in the Ingham Circuit Court against the Governor and others, seeking to enjoin distribution of public funds to public school academies and challenging the constitutionality of 1993 PA 362, which authorized the academies. The court, William Collette, J., determined 1993 PA 362 to be unconstitutional because public school academies were not under the immediate, exclusive control of the state, were not governed by publicly elected bodies, and, thus, were not public schools under Const 1963, art 8, § 2. The court further held that Act 362 divested the State Board of Education of its constitutional authority to provide leadership and general supervision over public education as required by Const 1963, art 8, § 3, and permanently enjoined distribution of any state school funding. The Court of Appeals, MARILYN KELLY, P.J., and D. A. TEEPLE, J. (O'CONNELL, J., dissenting), affirmed (Docket Nos. 180681, 181298, 181300). The defendants appeal.

In an opinion by Justice BRICKLEY, joined by Chief Justice MALLETT, and Justices RILEY and WEAVER, the Supreme Court *held*:

1993 PA 362 does not violate Const 1963, art 8, § 2 or § 3. The 1994 PA 416 repealer is valid and enforceable, requiring remand to the trial court for vacation of the injunction and entry of an order to the Department of Treasury to disburse funds to the public school academies operating under 1993 PA 362.

1. The Michigan Constitution does not mandate that the state have exclusive control of a school system. Public school academies are under the ultimate and immediate control of the state and its agents. Their charters may be revoked any time an authorizing body has a reasonable belief that grounds for revocation exist, the state exercises control over them through the application-approval process and controls their funding in the manner of other public schools, and academies may not charge tuition. While the boards of public school academies may or may not be elected, the public maintains control of the schools through the authorizing bodies.

Academy board members are public officials and are subject to all applicable law pertaining to public officials. Further, the Legislature intended that the School Code apply to public school academies.

2. Public school academies are not parochial schools. MCL 380.502(1); MSA 15.4502(1) specifically prohibits religious organization from organizing a public school academy and further prohibits any organizational or contractual affiliations with churches or other religious organizations.

3. Because the Legislature declared public school academies to be public schools, they are necessarily subject to the leadership and general supervision of the State Board of Education to the same extent as are all other public schools.

Vacated and remanded.

Justice CAVANAGH, concurring in part and dissenting in part, stated that the mandate of Const 1963, art 8, § 2 that the Legislature maintain and support a system of free public elementary and secondary schools primarily imposes an obligation to fund, rather than a responsibility to lead, supervise, or control, public schools. The lead opinion could be read to overstate the scope of the Legislature's authority with regard to public education. 1993 PA 362 provides for sufficient control of public school academies by public bodies, and, accordingly, is constitutional.

None of the parties has challenged the constitutionality of 1994 PA 416 or 1995 PA 289, and, therefore, leave was improvidently granted with respect to the issue of the 1994 PA 416 repealer provision.

Chief Justice MALLETT, concurring, agreed with the rationale and result of the majority opinion, and all but part II of Justice CAVANAGH's opinion.

Justice BOYLE, dissenting, stated that the Michigan charter schools act violates the Michigan Constitution and is invalid on its face. Because the issue of constitutionality of 1994 PA 416 and the subsequent amendment was not fully briefed or argued, this case should be remanded to the trial court for further development of whether the 1994 and 1995 amended acts are constitutionally valid.

1993 PA 362, the Michigan charter schools act, derogates the constitutional prohibition against the application of public funding to aid private schools under Const 1963, art 8, § 2 and usurps the authority of the State Board of Education to oversee and supervise public education in violation of Const 1963, art 8, § 3. The constitutional mandate is clear: No public monies are to be appropriated or paid directly or indirectly to aid or maintain any private or nonpublic school. In the view of the electorate, public fiscal backing of

nonpublic educational systems, no matter how well intentioned, is prohibited by the state constitution. If 1993 PA 362 privatizes charter schools, the fundamental constitutional value has been transgressed. Thus, unless art 8, § 2 is amended, the viability of the charter school initiative will depend on how public the system is under successive acts.

Although the Legislature was careful to identify charter schools as public schools for purposes of Const 1963, art 8, § 2, and as school districts for purposes of Const 1963, art 9, § 11, public school academies are controlled by privately selected, rather than publicly elected, boards of directors and are subject only to limited oversight by the authorizing bodies and the State Board of Education. Despite the fact that the State Board of Education is constitutionally mandated to lead and supervise public education, there is no provision under the 1993 act that grants authority to the State Board of Education to revoke a charter contract. Further, despite the fact that public school academies must comply with all applicable law, academy schools are not subject to large portions of the public School Code. In addition, Act 362 incorporates express provisions that are inconsistent with the conclusion that academy schools must comply with the public School Code.

Even assuming that public school academies are public schools under Const 1963, art 8, § 2, 1993 PA 362 would violate Const 1963, art 8, § 3 by divesting the State Board of Education of its constitutionally mandated authority to lead and supervise all public education. Under 1993 PA 362, the Board of Education has no authority to review an academy application, issue a charter contract, revoke a contract for lack of compliance, or oversee and approve an academy's educational goals, proposed curriculum, student assessment criteria, or length of student day. Any authority to oversee and supervise academy school activity has been vested in the authorizing body alone. The ability of the State Board of Education to lead and supervise public school academies is left to its ability to deny or revoke funding under the State School Aid Act. Because the constitution grants the State Board of Education general supervisory and leadership authority over public schools, and the power to act as the general planning and coordinating body for all public education, segregation of this power to funding matters alone is a violation of the constitution.

Justice KELLY took no part in the decision of this case.

216 Mich App 126; 548 NW2d 909 (1996) vacated.

*White, Przybylowicz, Schneider & Baird, P.C.* (by *Arthur R. Przybylowicz, William F. Young,* and

*Suzanne Krumholz Clark*), for the plaintiffs-appellees.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Paul J. Zimmer*, Assistant Attorney General, for defendants-appellants.

*Dykema, Gossett, P.L.L.C.* (by *Richard D. McLellan, Lori M. Silsbury*, and *Leonard C. Wolfe*), for intervening defendants-appellants Northlane Math and Science Academy and Central Michigan University.

*David A. Kallman* for defendants Berlin Orange Board and Noah Webster Academy.

Amici Curiae:

*Alfred H. Hall*, Senate Majority Counsel, *Shelly J. Edgerton*, and *Kenneth P. Poirier* and *Yvonne M. Balagna*, Assistants Majority Counsel, for Dick Posthumus, Senate Majority Leader.

*Mark H. Cousens* for Michigan Federation of Teachers and School Related Personnel and Organization of School Administrators and Supervisors.

BRICKLEY, J. This case concerns 1993 PA 362, the statute commonly known as the charter schools act, which authorized the creation of public school academies. The plaintiffs brought this suit to enjoin the distribution of public funds by challenging the constitutionality of the statute. Ingham Circuit Court Judge William Collette issued an opinion and order, declaring that the statute violated art 8, §§ 2 and 3 of the 1963 Michigan Constitution, and enjoined the distribu-

tion of any public funds. The Court of Appeals affirmed. 216 Mich App 126; 548 NW2d 909 (1996).

I

On December 24, 1993, the Michigan Legislature passed enrolled SB 896. On January 14, 1994, Governor John Engler signed the bill into law (1993 PA 362). Act 362 amended part 6A of the School Code, MCL 380.501 *et seq.*; MSA 15.4501 *et seq.*, and repealed all the sections created by 1993 PA 284.[1]

During the spring of 1994, Noah Webster Academy submitted an application to charter a public school academy to School District No. 3 Fractional of the Townships of Berlin and Orange. The application was accepted by the townships and the charter was authorized by the school district. During July and August of the same year, Ronald Helmer's application to start Northlane Math and Science Academy was considered and approved by Central Michigan University. Noah Webster Academy and Northlane Math and Science Academy applied to the state for funding.

The Department of Education made a formal decision on October 17, 1994, to approve Northlane Math and Science Academy and seven other public school academies for state funding. Noah Webster was the

---

[1] Act 362 has been amended twice since it took effect—1994 PA 416 and 1995 PA 289, commonly referred to as the Revised School Code.

The parties dispute whether this Court should consider the amendments when determining the constitutionality of this statute. It is only necessary for this Court to review 1993 PA 362 for several reasons. First, 1993 PA 362 is not moot. Several schools operated in 1994 under 1993 PA 362 and did not receive funding from the state. Second, the constitutionality of 1994 PA 416 and 1995 PA 289 have not been challenged or disputed by either party. Finally, the Legislature amended the acts to specifically correct the constitutional deficiencies that were noted by the trial court in this matter.

only applicant that was denied funding by the Department of Education because it did not meet the requirements of Act 362, as it was essentially a home-study school. Noah Webster has been operating since 1994 without funding.[2]

On August 18, 1994, the Council of Organizations and Others for Education About Parochiaid, Inc., two members of the State Board of Education, and others, filed suit in the Ingham Circuit Court, challenging the constitutionality of Act 362. Judge Collette dismissed the suit for lack of standing. On August 30, 1994, plaintiffs refiled the complaint, and a show cause hearing was scheduled. After several hearings, the parties filed cross-motions for summary disposition. On October 19, 1994, the trial court issued a preliminary injunction, preventing the Department of Treasury from issuing any state school aid payments to public school academies until a decision was made on the constitutionality of 1993 PA 362.

On November 1, 1994, the trial court determined that Act 362 was unconstitutional,[3] finding that public school academies were not under the "immediate,

---

[2] Public school academies that have been approved by the State Board of Education operate and receive funding pursuant to 1994 PA 416 and 1995 PA 289, MCL 380.511 *et seq.*; MSA 15.4511 *et seq.* They have received funding only from the date of the enactment of 1994 PA 416, not for the time that 1993 PA 362 was in effect.

[3] The plaintiffs had also alleged at the trial court level that the act violated Const 1963, art 9, § 11 (the school funding through sales tax provision). The trial court held that there was inadequate evidence to substantiate the claim. They did not cross appeal this issue in the Court of Appeals. Additionally, the School Code, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has since been amended to clarify that "[a] public school academy may not levy ad valorem property taxes or any other tax for any purpose." 1994 PA 416, subsection 503(8).

exclusive control of the state . . . ."[4] The court further held that public school academies were not governed by publicly elected bodies; therefore, public school academies were not "public schools" under art 8, § 2 of the Michigan Constitution.[5]

Additionally, the trial court held that Act 362 divested the State Board of Education of its constitutional authority to provide "[l]eadership and general supervision" over public education as required by Const 1963, art 8, § 3,[6] a finding that was based on a

---

[4] The circuit court formulated its control requirement by combining terms found in OAG, 1989-1990, No 6581, pp 103, 105 (May 8, 1989), with terms found in *Traverse City School Dist v Attorney General*, 384 Mich 390; 185 NW2d 9 (1971). In opinion No 6581, the Attorney General opined that the school in question was not a public school because it "is not under the exclusive control of the State of Michigan, and it is not generally open to all children in the school district in which it is located." The Attorney General's opinion concerned a tribal school that restricted admittance. In *Traverse City*, the Supreme Court stated that, for a shared-time arrangement between a public and an admittedly private school to withstand constitutional scrutiny, the sharing arrangement must be under the "ultimate and immediate" control of public school system authorities. *Id.* at 415.

[5] Art 8, § 2 provides:

The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.

No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

[6] Const 1963, art 8, § 3 provides as follows:

comparison of 1993 PA 284 and 1993 PA 362.[7] Consequently, a permanent injunction was issued, prohibiting the dispersion of any state school funding.

On November 28, 1994, the Attorney General appealed in the Court of Appeals. Noah Webster, Northlane, New Branches, and CMU filed claims of appeal on November 29 and 30, respectively. The Court of Appeals, in a two-to-one decision by Judge MARILYN KELLY, affirmed the trial court's finding that Act 362 was unconstitutional. 216 Mich App 135. The majority held that because the statute lacks a mechanism that mandates that a public body select the board of directors for the school, it does not meet the constitutional standard of Const 1963, art 8, § 2. *Id.* at 134-135. However, Judge O'CONNELL stated in his dissent that the majority was acting as a "super legislature," that the majority employed an incorrect standard of review, and that the public school academy act was constitutional. *Id.* at 135, 160.

On December 13, 1994, the Legislature passed Act 416, which amended Act 362 by amending part 6A and establishing part 6B. The public school acad-

---

Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.

[7] Public school academies were initially established by 1993 PA 284. The Legislature repealed Act 284 before it became effective. 1993 PA 362. Both lower courts questioned why Act 284 was repealed before its taking effect. However, the reason for the repeal does not influence the facial constitutionality of 1993 PA 362. This Court gives deference to a deliberate act of the Legislature, and does not inquire into the wisdom of its legislation. *Dearborn Twp v Dearborn Twp Clerk*, 334 Mich 673, 690; 55 NW2d 201 (1952).

emies currently operating in the state do so under part 6B. Many of the amendments of part 6A were made in response to the trial court's rulings. The Legislature designed Act 416 so that, if a court found Act 362 to be constitutional, then part 6B of Act 416 would automatically repeal itself and only the provisions of 6A would apply.

II

In order to determine the constitutionality of the statute, a review of its provisions is necessary. Under Act 362, a public school academy is organized as a nonprofit corporation under the Nonprofit Corporation Act. MCL 450.2101 *et seq.*;   MSA 21.197(101) *et seq.* Subsection 502(1). A public school academy is administered under the direction of a board of directors in accordance with Act 362 and the nonprofit corporation bylaws contained in the public school academy's contract. Section 502.

To organize a public school academy, an applicant, either a person or an entity, must submit an application to an authorizing body. Act 362 contains specific information that must be included with every public school academy application. It must include at least the identification of the applicant, subsection 502(3)(a), a list of the proposed members of the board of directors or a description of the qualifications and method for appointment or election,[8] and the articles of incorporation and the bylaws. The articles of incorporation are to include the names of the proposed public school academy and of the authorizing body, the purposes of the public school academy

---

[8] Which is subject to the authority of the authorizing board under subsection 503(3).

corporation, and the proposed time that the articles of incorporation will be effective. Subsection 502(3)(c)(i)-(v). The proposed bylaws must include a copy of the governing structure of the public school academy, a copy of the education goals, curriculum to be offered, method of pupil assessment, and the admission policy,[9] the school calendar and school day schedule, and the age or grade range of the pupils to be enrolled. Subsection 502(3)(d)(i)-(v).

Moreover, the application must include descriptions of the staff responsibilities as well as an agreement that "the public school academy will comply with the provisions of [part 6A of the School Code] and, subject to the provisions of this part, with all other state law applicable to public bodies and with federal law applicable to public bodies or school districts." Subsection 502(3)(g). If the public school academy is authorized by a school district, there must be an assurance that the public school academy will be covered by the collective bargaining agreements that apply to other employees of the school district. Subsection 502(3)(h).

Act 362 specifies four types of authorizing bodies: (1) the board of a school district, (2) intermediate school board, (3) the board of a community college, and (4) the governing board of a state public university. Subsection 501(2). An authorizing body is not required to issue any public school academy contracts, but if it does, it must issue the contracts "on a competitive basis taking into consideration the resources available for the proposed public school

_____

[9] The admission policy must comply with § 504. Subsection 502(3)(d)(iii).

academy, the population to be served by the proposed public school academy, and the educational goals to be achieved by the proposed public school academy." Subsection 503(1). Before granting a contract to operate a public school academy, an authorizing body is required to adopt a resolution establishing the method of selection, length of term, and number of members of the public school academy's board of directors. Subsection 503(3).

The authorizing body for a public school academy is the fiscal agent for the public school academy, and its aid payments are paid to the authorizing body. The authorizing body is responsible for the public school academy's compliance with the contract and all applicable law. Section 507. Further, the contract may be revoked at any time the public school academy fails to abide by the statute.

Subsection 501(1) states that "[a] public school academy is a public school under section 2 of article VIII of the state constitution of 1963, and is considered to be a school district for the purposes of section 11 of article IX of the state constitution of 1963." Act 362 does not expressly limit the power of a board of education. In fact, Act 362 states that "[a] public school academy shall comply with all applicable law . . . ." Subsection 503(5). Moreover, the act states that a church or other religious organization cannot organize a public school academy and that a public school academy is prohibited from having organizational or contractual affiliations with churches or other religious organizations to the extent such agreements are prohibited by the state or federal constitutions. Subsection 502(1).

Furthermore, Act 362 specifically provides that a public school academy is prohibited from charging tuition and is required to abide by the pupil admission policies set forth in the statute. Section 504. If the public school academy has more applicants than space, it is required to hold a random selection process for the enrollment of its students. *Id.*

III

When compelled to make a constitutional pronouncement, the court must do so with great circumspection and trepidation, with language carefully tailored to be no broader than that demanded by the particular facts of the case rendering such a pronouncement necessary. *United States v Raines*, 362 US 17, 21; 80 S Ct 519; 4 L Ed 2d 524 (1960).

> The court will not go out of its way to test the operation of a law under every conceivable set of circumstances. The court can only determine the validity of an act in the light of the facts before it. Constitutional questions are not to be dealt with in the abstract. [*General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940).   Accord *Regents of Univ of Michigan v Michigan*, 395 Mich 52; 235 NW2d 1 (1975);   *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987).]

The party challenging the facial constitutionality of an act "must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . ." *Salerno, supra* at 745. "[I]f any state of facts reasonably can be conceived that would sustain [a legislative act], the existence of the state of facts at the time the law was enacted must be assumed." 16

Am Jur 2d, Constitutional Law, § 218, p 642. Further, "[a] statute may be constitutional although it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements, and in this situation the court is justified in holding that the statute was intended to be subject to such requirements, and that those requirements are to be considered as embodied in the statute." *Id.*, § 225, p 659.

This Court articulated three rules of constitutional construction in *Traverse City School Dist* v *Attorney General*, 384 Mich 390; 185 NW2d 9 (1971). Justice WILLIAMS stated that the primary rule of construction is the rule of "common understanding." *Id.* at 405. Justice COOLEY defined this rule in his treatise on Constitutional Limitations:

> "A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81)." [*Id.*]

A second rule is that to clarify the meaning of a constitutional provision, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point the Court has said:

> In construing constitutional provisions where the meaning may be questioned, the court should have regard to the

circumstances leading to their adoption and the purpose
sought to be accomplished. [*Kearney v Bd of State Audi-*
*tors,* 189 Mich 666, 673; 155 NW 510 (1915).]

A third rule is that, wherever possible, an interpre-
tation that does not create constitutional invalidity is
preferred to one that does. Chief Justice Marshall pur-
sued this thought fully in *Marbury v Madison,* 5 US
(1 Cranch) 137, 175; 2 L Ed 60 (1803):

> If any other construction would render the clause inoper-
> ative, that is an additional reason for rejecting such other
> construction, and for adhering to their [the clauses'] obvi-
> ous meaning.

This Court gives deference to a deliberate act of
the Legislature, and does not inquire into the wisdom
of its legislation. *Dearborn Twp v Dearborn Twp
Clerk,* 334 Mich 673, 690; 55 NW2d 201 (1952). The
power to declare a law unconstitutional should be
exercised with extreme caution and never where seri-
ous doubt exists with regard to the conflict. *Thayer v
Dep't of Agriculture,* 323 Mich 403, 413; 35 NW2d 360
(1949). "Every reasonable presumption or intendment
must be indulged in favor of the validity of the act,
and it is only when invalidity appears so clearly as to
leave no room for reasonable doubt that it violates
some provision of the Constitution that a court will
refuse to sustain its validity." *Cady v Detroit,* 289
Mich 499, 505; 286 NW 805 (1939).

In construing the constitutionality of a statute, we
examine the statute's requirements rather than the
method by which the individual schools administer
their programs. *Rassner v Federal Collateral Society,
Inc,* 299 Mich 206, 217-218; 300 NW 45 (1941). A valid
statute is not rendered unconstitutional on the basis

of improper administration. *People v Kirby*, 440 Mich 485, 493; 487 NW2d 404 (1992). Similarly, an invalid statute is not redeemed by compensating actions on the part of its administrators. *Rassner, supra.* The constitutionality of a law must be tested by what may be done under it without offending any express provision of the constitution. *Cummings v Garner*, 213 Mich 408, 435; 182 NW 9 (1921).

IV

The 1963 Michigan Constitution does not define the term "public schools." However, it does state that the Legislature has the responsibility for "maintain[ing] and support[ing] a system of free public education . . . ."[10] Art 8, § 2. The Legislature has had the task of defining the form and the institutional structure through which public education is delivered in Michigan since the time Michigan became a state. See Const 1835, art 10, § 3.

The appellees assert that the system established by our Legislature violates art 8, § 2 because public school academies are not public, 1) in that they are not under the ultimate and immediate, or exclusive, control of the state and 2) because the academy's board of directors is not publicly elected or appointed by a public body.

A

Using the definition of "public school" set forth in OAG, 1989-1990, No 6581, p 105, the plaintiffs reason

---

[10] The School Code, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has since been amended to define expressly the term "public school" so as to encompass public school academies. 1994 PA 416, § 5(6). However, this Court must independently determine the meaning of constitutional terms.

that public school academies are not public schools
because they were not under the immediate and
exclusive control of the state. *Traverse City, supra.*[11]

In *Traverse City*, this Court answered several
issues in a declaratory action. School districts ques-
tioned the constitutionality of existing shared-time
activities and auxiliary services provided to nonpublic
school students. *Traverse City* did not address what
made a school public or nonpublic, but instead
whether a public school could provide services such
as driver's education to students in parochial schools.
The Court held that the services that were under the
immediate and exclusive control of the state could be
rendered to the students of nonpublic schools
because then they were "public services."

Our constitution does not mandate exclusive con-
trol, it requires that "[t]he legislature shall maintain
and support a system of free public elementary and
secondary schools . . . ." Art 8, § 2.    Therefore,
plaintiff's first assertion fails because there is no
requirement in our constitution that the state must
have exclusive control of the school system.

While our constitution requires only that the Legis-
lature "maintain and support a system" of public
schools, the parties argue and several other states
have recognized the need for the state to have some

---

[11] The trial court held:

   This Court determines that a school must be under the immedi-
   ate, exclusive control of the state to pass constitutional muster, as
   well as being open to all students that care to attend.

The court then examined the act and reasoned that, because it would
be possible for an authorizing body to grant a charter that did not satisfy
its "immediate, exclusive control" requirement, the act was in violation of
Const 1963, art 8, § 2.

control in order to qualify for public funding. See, generally, 78 CJS, School and School Districts, § 2(b), pp 38-39. Michigan's public school academies meet this requirement because they are under the ultimate and immediate control of the state and its agents. First, a charter may be revoked any time the authorizing body has a reasonable belief that grounds for revocation exist, such as either the academy's failure to abide by the terms of its charter or its failure to comply with all applicable law. Subsections 507(a)-(d).

Second, because authorizing bodies are public institutions, the state exercises control over public school academies through the application-approval process. During this process, the authorizing body can reject any application with which it is not completely satisfied in any detail, and through the authorizing body's right to revoke the charter of any public school academy that does not comply with its charter.

Third, the state controls the money. The act provides for the funding of public school academies in the manner of other public schools, § 507, and public school academies may not charge tuition. Subsection 504(2).[12] The framers of our constitution stated that "restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are better left to legislative determination." 2 Official Record, Constitutional Convention 1961, p 3395. If a school meets the qualifications set by the Legislature

---

[12] In *Richter v Cordes*, 100 Mich 278; 58 NW 1110 (1894), the parties disputed whether a certain building that had been used as a school properly belonged to the school district or to an adjoining church. The state of the deed was unclear. Despite the fact that overtly religious instruction had been given in the school, this Court ruled that *the fact that the school had received public funding necessarily meant that the school was public. Id.* at 285.

for state funding, and does not offend any constitutional protection, it qualifies as a public school.

Finally, the Legislature intended the other sections of the School Code to apply to the public school academies.[13] There are no specific restrictions in 1993 PA 362 that would limit the power of the state. Additionally, the intent of the Legislature is evidence by 1995 PA 289, where the School Code was revised and public school academies were specifically included in the Revised School Code provisions.[14]

---

[13] The dissent asserts that public school academies are not required to comply with other sections of the public School Code. However, it is evident that other sections of the School Code apply, unless they are specifically exempt. "It is elementary that statutes in pari materia are to be taken together in ascertaining the intention of the legislature, and that courts will regard all statutes upon the same general subject matter as part of 1 system." *Dearborn Twp Clerk v Jones*, 335 Mich 658, 662; 57 NW2d 40 (1953). This Court has further held that "[i]n the construction of a particular statute, or in the interpretation of any of its provisions, all acts relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law." *Id.*

1993 PA 362, subsection 501(1) provides in relevant part that "[a] public school academy is . . . considered to be a school district for the purposes of section 11 of article IX of the state constitution of 1963," which is the state school aid provision. The State School Aid Act, MCL 388.1601; MSA 15.1919(901) provides the safeguards and controls that are questioned by the dissent, including MCL 388.1609; MSA 15.1919(909), which provided that "the department [of education] shall promulgate rules necessary to implement and administer this act."

One provision in 1993 PA 362 specifically provides for the use of noncertified teachers. Section 505 provides that noncertified teachers may be used only if the teacher is a full-time faculty member of the authorizing body and has been granted tenure or is on a tenure track at a public university or if the teacher has taught the subject for five years at a community college.

[14] Public school academies are specifically included in several statutes, see, generally, MCL 380.1137; MSA 15.41137 (rights of parents and legal guardians); MCL 380.1221; MSA 15.41221 (treasurer of the school board must deposit funds in bank, savings and loan, or credit union); MCL 380.1230; MSA 15.41230 (requiring criminal background checks for employees); MCL 380.1267; MSA 15.41267 (competitive bids for construction contracts), and MCL 380.1274; MSA 15.41274 (procurement of supplies, materials, and equipment).

B

The plaintiffs further argue that because a public school academy is run by a private board of directors and because the authorizing body has no means for selecting members of the board, the public school academies are not public schools.

This Court has stated:

> The authority granted by the Constitution to the Legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school districts, to define their powers and duties, their term of office, *and how and by whom they should be chosen.* [*Belles v Burr*, 76 Mich 1, 11; 43 NW 24 (1889)  (emphasis supplied). See also *Penn School Dist No 7 v Lewis Cass Intermediate School Dist Bd of Ed*, 14 Mich App 109, 125-126; 165 NW2d 464 (1968).]

Subsection 503(3) of 1993 PA 362  provides:

> An authorizing body shall adopt a resolution establishing the method of selection, length of term, and number of members of the board of directors of each public school academy subject to its jurisdiction.

Therefore, the Legislature has mandated the board of directors' selection process. The Legislature has this control, and it can change this process at any time.

Additionally, the board of the authorizing bodies is publicly elected or appointed by public bodies. While the boards of the public school academies may or

---

We are not using the revisions of 1995 PA 289  to make 1993 PA 362 constitutional. 1995 PA 289  merely evidences the intent of the Legislature to have control over the public school academies.

may not be elected, the public maintains control of the schools through the authorizing bodies.

C

Further, if we examine the common understanding of what a "public school" is, as adopted by the 1961 Constitutional Convention, for the first paragraph of § 2, and if we inquire into the common understanding of "private, denominational or other nonpublic" school, as adopted by the voters in 1970 for the second paragraph of § 2, we find that public school academies are "public schools." Under 78 CJS, Schools and School Districts, § 2, p 39, a "public school" is

> established and maintained at public expense, primarily from moneys raised by general taxation, as contradistinguished from a private or denominational school, or, in other words, a school comprised in the free school system which has been generally adopted in the United States.[15]

It has further been defined as,

> broadly speaking, open and public to all in the locality,[16] which the state undertakes through various boards and officers to direct, manage, and control,[17] and which is sub-

---

[15] It is important to note that Michigan is not alone in operating charter schools. As of January 1997, at least twenty-four other states and the District of Columbia have enacted charter school acts, including: Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, North Carolina, Rhode Island, South Carolina, Texas, Wisconsin, and Wyoming.

[16] *Special School Dist No 65 Logan Co v Bangs*, 144 Ark 34; 221 SW 1060 (1920).

[17] *Silver Lake Consolidated School Dist v Parker*, 238 Iowa 984; 29 NW2d 214 (1947).

ject to and under the control of the qualified voters of the
school district in which it is situate. [*Id.*][18]

The Washington Supreme Court held that a com-
mon school (public school) "within the meaning of
[the State of Washington's Constitution] is . . . com-
mon to all children of proper age and capacity, free,
and subject to and under the control of the qualified
voters of the school district." *State ex rel School Dist
No 3 v Preston,* 79 Wash 286, 289; 140 P 350 (1914).

However, we do not have a requirement in our
state constitution that mandates that the school be
under the control of the voters of the school district.
In fact, a review of our constitutional history shows
that our forefathers envisioned public education to be
under the control of the Legislature, which is under
the command of the entire state electorate. The Con-
stitution of 1835 stated:

> The legislature shall provide for a system of common
> schools, by which a school shall be kept up and supported
> in each school district at least three months in every year;
> and any school district neglecting to keep up and support
> such a school, may be deprived of its equal proportion of
> the interest of the public fund. [Art 10, § 3.]

There was no requirement in the 1835 Constitution
that the members of the school board for the local
district be elected by the local voters.

During the 1850 Constitutional Convention, the edu-
cation article was amended after much discussion
regarding "free education." The education article was
renumbered art 13, and revisions were made. The del-

---

[18] *State ex rel School Dist No 3 v Preston,* 79 Wash 286; 140 P 350
(1914).

egates discussed at some length the nature of the revisions and how specific the constitution should be written. They eventually agreed that the Legislature should be given deference. As one delegate noted,

I think that the Legislature should establish by law a system of common schools, and I think the subject should be left in their hands; as the system is in progress, it should be left for the Legislature to decide upon, and properly amend it from time to time. We might adopt a system that would, in the practical working, be found not to be the best. This matter should be left to be judged upon by the progress of the age.

I am willing to trust the Legislature, for this reason—if they pass a law in relation to primary schools, and it is found not to be good, the power returns to the people; in fact, it is the only way that the people can decide upon the subject. [Constitutional Convention of 1850, p 265.]

The people of this state then adopted § 4, which stated:

The legislature shall, within five years from the adoption of this constitution, provide for and establish a system of primary schools, whereby a school shall be kept without charge for tuition at least three months in each year in every school district in the state, and all instruction in said school shall be conducted in the English language. [Const 1850, art 13, § 4.]

The Constitution of 1908 incorporated a section that was intended to evidence the state's encouragement of education. Section one stated:

Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. [Art 11, § 1.]

The primary school provision was also amended:

> The legislature shall continue a system of primary schools, whereby every school district in the state shall provide for the education of its pupils without charge for tuition; all instruction in such schools shall be conducted in the English language. [Art 11, § 9.]

The Constitution of 1963 also made changes to the education article. The article was rewritten to exclude much of the limiting language that existed in the 1908 Constitution, art 11, § 9, and to clarify the powers of the State Board of Education. Article 8, § 2 was amended to state: "The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin." This required the Legislature to "maintain and support" public schools rather than the former requirement to "continue a system of primary schools."

This review of the history of the education article shows that there was never a requirement that the local school board had to be appointed by a public body as opined by the Court of Appeals majority in this case. Finally, we note that several schools in the state are organized and maintained without any local control. The Michigan School for the Deaf in Flint, the Michigan School for the Blind in Lansing, and the Rehabilitation Institute for Veterans and Disabled Adults at Pine Lake, are controlled by the State Board of Education, not by the local school districts. MCL 388.1010; MSA 15.1023(10).

D

The parochiaid amendment does not limit the definition of public schools to exclude public school academies. Article 8, § 2 was amended by the electorate in 1970 by what is commonly known as the parochiaid amendment. This amendment added to § 2 the following language:

> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

*Traverse City* discussed the circumstances surrounding the parochiaid amendment: "In 1968, the legislature created a joint committee to study the question of aid to private schools. The committee recommended to the 1969 legislature that it enact parochiaid. (*A Report and Recommendations of the Joint Legislative Committee on Aid to Non-Public Schools*, January 16, 1969. See especially pp 25-30.)" *Id.* at 408, n 2.[19] Several measures were introduced

---

[19] The history of the parochiaid amendment was summarized by Justice WILLIAMS as follows:

House Bill 3875, which embodied the committee's recommendation was defeated by eight votes in the House. Two unsuccessful

### and defeated that would have authorized tax relief for

bills were introduced during the 1969 legislative session designed to give tax relief to tuition paying parents of children attending private schools. Senate Bill 1097 provided for a tax credit for any person who paid tuition for students in elementary or secondary grades in private schools. House Bill 2697 proposed that individual taxpayers be allowed to subtract the cost of tuition, books and fees for any school or college from their adjusted gross income to determine taxable income for the Michigan income tax.

Subsequent to the House defeat of parochiaid, the Governor created a Committee on Educational Reform. The Committee recommended that the legislature enact parochiaid. (*Report of the Governor's Commission on Educational Reform*, September 30, 1969. See especially p 15.) Senate Bill 1082, which included the committee's recommendation adopted by the Governor, was passed by the Senate in the 1969 session. Foreseeing House approval, the Governor included $22 million in his estimated state budget for 1970 to fund the parochiaid scheme. During February of 1970 the House approved parochiaid. The measure was sent to a joint House-Senate conference committee.

In contrast to the prior forms of state aid, parochiaid generated heated controversy both inside and outside the legislature. It took the legislature over two years to enact it. When it became clear in February of 1970 that the legislature would pass parochiaid, a group of citizens called Council Against Parochiaid circulated petitions containing the present language of Proposal C. They succeeded in obtaining sufficient signatures to place the proposal on the ballot for the next general election on November 3, 1970. However, the State Board of Canvassers refused to certify it on the grounds the petition was defective. But, the Michigan Court of Appeals in a mandamus action brought by members of the Council Against Parochiaid ordered Proposal C on the ballot. *Carman v Secretary of State* (1970), 26 Mich App 403 [182 NW2d 563].

On September 14, 1970, this Court rendered two important decisions. It denied leave to appeal *Carman* and upheld the constitutional validity of parochiaid. *Advisory Opinion re Constitutionality of PA 1970, No 100* (1970), 384 Mich 82 [180 NW2d 265]. Thus, it was clear by that date that parochiaid was law in Michigan. Indeed, funds were paid out under the parochiaid scheme following the decision by the Michigan Supreme Court to eligible private schools who accepted the aid. It was also clear that the Council against Parochiaid had its challenge ready in the form of Proposal C on the fall ballot.

The stage was set for the election on November 3, 1970, for the voters to speak their judgment when they voted on Proposal C. The news media and even the active supporters and opponents of Proposal C referred to it as the "Parochiaid Proposal." Everyone

parents who paid tuition. When it became clear in February of 1970 that the Legislature would pass parochiaid, a group of citizens called Council Against Parochiaid circulated petitions containing the language of what was Proposal C. *Id.* at 409, n 2. They succeeded in obtaining sufficient signatures to place the proposal on the ballot for the next general election on November 3, 1970. *Id.*

As far as the voters were concerned in 1970, the result of all the preelection talk and action concerning Proposal C was simply this "—*Proposal C was an anti-parochiaid amendment—no public monies to run parochial schools—and beyond that all else was*

agreed the proposed amendment was designed to halt parochiaid and would have that effect if adopted.

What was unclear was the impact the amendment would have on other forms of state aid to private schools. During the campaign the voter was barraged with contradictory statements on what effect the proposal would have on these various forms of state aid. Pursuant to the advice of the Attorney General, both Governor Milliken and John W. Porter, the Acting Superintendent of Public Instruction, made public statements to the effect that adoption of the amendment would terminate auxiliary service programs for nonpublic school students, jeopardize the availability of Federal funds under Title I of the Elementary and Secondary Education Act of 1965, end tax exemptions for nonpublic schools including the property tax exemption secured to nonpublic schools by Article 9, § 4 of the Michigan Constitution, and possibly affect fire and police protection as well as sewage and sanitation services (Stipulation of Facts paragraphs 2 and 3).

Erwin B. Ellmann, a spokesman for the Council Against Parochiaid, who, as a lawyer, played a key role in drafting the amendment, took issue with the statements of Governor Milliken and Mr. Porter. In published letters to Mr. Porter and the Michigan electorate, he said Proposal C would not terminate shared time or bar nonpublic school students from receiving auxiliary services; it would only limit shared time and auxiliary services to those offered at the public school. Nor would the proposal cut off Federal funds, jeopardize fire or police protection or sewage and sanitation services or terminate the property tax exemption according to Mr. Ellmann. [*Id.* at 408-410, n 2.]

*utter and complete confusion." Id.* at 410, n 2. On November 3, 1970, the proposal was adopted by the electorate, and, as far as parochiaid was concerned, the voters rejected it. *Id.*

Therefore, the common understanding of the voters in 1970 was that no monies would be spent to run a parochial school. However, public school academies are not parochial schools. The statute specifically prohibits religious organization from organizing a public school academy and further prohibits any organizational or contractual affiliations with churches or other religious organizations. Subsection 502(1). Additionally, a public school academy is not a parochial school in that the charging of tuition is prohibited, as is any restriction on admission other than a random selection process if the school has more applicants than space. Subsection 504(2).

V

The plaintiffs argue that the act violates Const 1963, art 8, § 3 because it allegedly divests the State Board of Education of its duty to lead and exercise general supervision over public education.

Article 8, § 3 provides in relevant part that the "Leadership and general supervision over all public education . . . is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education . . . and shall advise the legislature as to the financial requirements in connection therewith."

Because the Legislature declared that public school academies are public schools, subsection 501(1), they are necessarily subject to the leadership and general supervision of the State Board of Education to the

same extent as are all other public schools. Further, subsection 503(5) provides that a "public school academy shall comply with all applicable law," a requirement that incorporates the constitutional provision in issue.[20] As stated in 16 Am Jur 2d, Constitutional Law, § 225, p 659: "A statute may be constitutional although it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements . . . ."

Additionally, the authority of the state board over public schools is established by other statutes. The state board implementing statute, MCL 388.1009; MSA 15.1023(9), provides that the board has powers of supervision over all public education. MCL 388.1015; MSA 15.1023(15) provides the board with the authorization to prescribe rules and regulations that it deems necessary to carry out the provisions of the act.[21]

Thus, it is clear that the board retains its constitutional authority over public school academies. As noted in *State Bd of Ed v Houghton Lake Community Schools*, 430 Mich 658; 425 NW2d 80 (1988), the principal means by which the state board exercises its powers over all school districts is through the State

---

[20] The School Code, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, has since been amended to make explicit that public school academies are "subject to the leadership and general supervision of the state board [of education] over all public education under section 3 of article VIII of the state constitution of 1963." 1994 PA 416, subsection 501(1).

[21] The dissent argues that because the act does not provide the State Board of Education authority over the selection, retention, or removal of members of the charter school board of education, the act violates the constitution. However, the State Board of Education does not have authority over the selection, retention, or removal of the members of the boards of traditional public schools; therefore, the public school academies are no different in this regard.

School    Aid    Act.    MCL    388.1601    *et    seq.*;
MSA 15.1919(901) *et seq.* See MCL 388.1603(5); MSA
15.1919(903)(5).   This is evidenced by the power of
the board to deny funding, as it did to Noah Webster.
It should also be noted that public school academy
board members are public officials and are subject to
all applicable law pertaining to public officials.[22]

### VI

The plaintiffs state that § 518, the repealing section,
constitutes an unconstitutional delegation of legisla-
tive authority. The repeal of a statute is a legislative
act that may not be delegated. *Atlas v Wayne Co Bd
of Auditors*, 281 Mich 596; 275 NW 507 (1937). It is
the function of the judiciary to determine existing
rights, not to enact or repeal legislation. To predicate
the statute on the act of the judiciary may influence
the decision of this Court.

Section 518 provides:

---

[22] The issue who is and who is not a public official was discussed in
*Bandfield v Wood*, 104 Mich App 279, 282; 304 NW2d 551 (1981), quoting
*People v Freeland*, 308 Mich 449, 457-458; 14 NW2d 62 (1944):

"After an exhaustive examination of the authorities, we hold that
five elements are indispensable in any position of public employ-
ment, in order to make it a public office of a civil nature: (1) It
must be created by the Constitution or by the legislature or created
by a municipality or other body through authority conferred by the
legislature; (2) it must possess a delegation of a portion of the sov-
ereign power of government, to be exercised for the benefit of the
public; (3) the powers conferred, and the duties to be discharged,
must be defined, directly or impliedly, by the legislature or through
legislative authority; (4) the duties must be performed indepen-
dently and without control of a superior power other than the law,
unless they be those of an inferior or subordinate office, created or
authorized by the legislature, and by it placed under the general
control of a superior officer or body; (5) it must have some perma-
nency and continuity, and not be only temporary or occasional."

This part is repealed if the final disposition of *council of organizations and others for education about parochiaid, inc., et al., v John Engler* (Ingham county circuit court case no. 94-78461-AW) is that part 6a, as added by Act No. 362 of the Public Acts of 1993, is held by a court of competent jurisdiction to be constitutional, effective, or otherwise valid.

There is no law (statutory or case) that prevents a Legislature from predicating the effectiveness of an act on the happening of an event. The "legislature may enact a valid law to take effect upon the happening of any future event, certain or contingent, which does not involve the exercise by others of that legislative will and discretion, which cannot be constitutionally delegated." *McCall v Calhoun Circuit Judge,* 146 Mich 319, 323; 109 NW 601 (1906). Ruling on the constitutionality of a statute is a judicial function, not a legislative one. The Legislature has conditioned other acts on voter action. In 1993 PA 336 the Legislature enacted a new school finance system. The act had two alternatives, the first was conditioned on the passage of Proposal A (six percent sales tax), the second alternative was if Proposal A failed. Additionally, one statute that prohibited assisting in a suicide had a provision that provided for a prospective repeal six months after the legislative-appointed commission made its recommendations to the Legislature. MCL 752.1027(5); MSA 28.547(127)(5).

If this Court finds 1993 PA 362 constitutional, the Legislature could repeal part 6B the next day. Therefore, we hold that the repealer does not infringe on the separation of powers.

VII

We hold that 1993 PA 362 does not violate art 8, § 2 or art 8, § 3 of the Michigan Constitution of 1963. Further, we hold that the repealer in 1994 PA 416 is valid and enforceable.[23] We remand this case to the trial court for it to vacate its injunction and order the Department of Treasury to make payments to the public school academies that were operating under 1993 PA 362.

MALLETT, C.J., and RILEY and WEAVER, JJ., concurred with BRICKLEY, J.

CAVANAGH, J. *(concurring in part and dissenting in part)*. I agree with the general conclusion of the majority that the Court of Appeals majority incorrectly focused solely on the fact that 1993 PA 362 does not require that a public body select the board of directors for each public school academy. Accordingly, I concur in the judgment that 1993 PA 362 is constitutionally valid. I write separately, however, because of my concern that the majority can be read as an undue aggrandizement of the power of the Legislature vis-à-vis the body in which plenary and overarching authority over public education is vested by our constitution: the State Board of Education.

I

The majority does acknowledge the authority of the State Board of Education. *Ante*, pp 583-585. However,

---

[23] We note that MCL 380.518; MSA 15.4518 provides for the repeal of §§ 511 to 517 only. Therefore, the revisions made by 1994 PA 416 and 1995 PA 289 to the remainder of the Revised School Code are unaffected by the repealer.

certain emphasis in its analysis compels me to focus on the board's ultimate authority.

The majority states: "Our constitution does not mandate exclusive control, it requires that '[t]he legislature shall maintain and support a system of free public elementary and secondary schools . . . .' " *Ante*, p 572. In my view, this confuses the concept of "control" with that of "maint[enance] and support." The term "control" is synonymous with the constitutional phrase "[l]eadership and general supervision," Const 1963, art 8, § 3, in the context of public education. The constitutional mandate that "[t]he legislature shall maintain and support a system of free public elementary and secondary schools," Const 1963, art 8, § 2, primarily imposes an obligation to fund—rather than a responsibility to lead, supervise, or control—public schools.

I wish to emphasize that I do not read the majority as an attempt to overstate the scope of the Legislature's authority with regard to public education. I do think, however, that the majority is susceptible to such a reading, and therefore write separately to foreclose such a possibility.

As the majority concludes, 1993 PA 362 provides for sufficient control of public school academies by public bodies. Accordingly, I concur in its judgment with regard to the constitutionality of 1993 PA 362.[1]

---

[1] I am satisfied this is so as evidenced by the Legislature's pronouncement of its intent in 1995 PA 289. Under § 1278(1) of the 1995 act, in order for a public school to be accredited, the public schools must meet core academic curriculum requirements. Furthermore, under § 1531, public school teachers must possess a teaching certificate. As previously noted by the majority, under § 501(1) a public school academy is a public school. Therefore, public school academies are under significant control of public bodies.

II

I also write separately to express my disagreement with the majority's review of the repealer provision of 1994 PA 416. As a threshold matter, it is undisputed that none of the parties has challenged the constitutionality of either 1994 PA 416 or 1995 PA 289. In my opinion, therefore, we are not required to resolve this nebulous question, and I would hold that leave was improvidently granted on this issue.

Regarding the merits of the majority's analysis of the argument that the repealer provision is an unconstitutional delegation of legislative authority, I would note that the fact that "[t]he Legislature has conditioned other acts on voter action," *ante*, p 586, does not answer the question whether the Legislature can make the ultimate content of a legislative enactment solely contingent on judicial action. The obvious difference is that voters expressly share in the legislative power, as evidenced by the initiative and the referendum. See Const 1963, art 2, § 9.

MALLETT, C.J. (*concurring*). I agree with the rationale and result of the majority opinion. I also agree with all but part II of Justice CAVANAGH's opinion.

BOYLE, J. (*dissenting*). This case is about the inevitable tension that exists between the intent to create schools that are free from the burden of regulation in order to allow experiments in improved learning, and the constitutional imperative that public funds not be used for private purposes. While the Legislature has unquestioned authority to define by law what is required of public schools,[1] and to privatize the deliv-

---

[1] Const 1963, art 8, § 2.

ery of certain services, it obviously cannot make what is private, public, simply by declaring it so. In creating charter schools, the Legislature clearly recognized this truism and provided for certain indicia of what is public. The issue before this Court, therefore, is how much public control is necessary to comply with the constitutional directive.

In my view, 1993 PA 362, the Michigan charter schools act, derogates the constitutional prohibition against the application of public funding to aid private schools under art 8, § 2 of the Michigan Constitution and usurps the authority of the State Board of Education to oversee and supervise public education in violation of Const 1963, art 8, § 3. Given that observation, I conclude that the act violates the Michigan Constitution and is invalid on its face, and I would affirm the Court of Appeals decision. Because the issue of constitutionality of 1994 PA 416 and the subsequent amendment was not fully briefed or argued before this Court, I would remand this case to the trial court for further development of the issue whether the 1994 and 1995 amended acts are constitutionally valid. The goal of increasing parental choice in education must be evaluated in light of the constitutional directive that has been a fundamental goal of this state since before incorporation.

I

Article 8, § 2 of the Michigan Constitution provides in part:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. . . .

> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. . . .

The constitutional mandate is clear: "No public monies . . . shall be appropriated or paid . . . directly or indirectly to aid or maintain any private . . . or . . . nonpublic . . . school." *Id.* In the view of the electorate, and by necessity, therefore, in the eyes of those elected, public fiscal backing of nonpublic educational systems, no matter how well intentioned, is prohibited by state constitution.

A

Approximately twenty-five states, including Michigan, and the District of Columbia have enacted charter school legislation.[2] An innovative and creative bid at educational reform, charter schools are public schools that are autonomous, at least in part, from state regulation.[3] Called schools " 'that have no rules,' "[4] at least one proponent of charter schools has said that " '[t]he best . . . [charter] schools have near total independence to decide what to teach and how to teach it, whom to hire and how to use their

---

[2] *Ante,* p 576, n 15.

[3] See, generally, Furst, *The short but very curious legal history of Michigan's charter schools,* 105 Ed Law Rep 1 (1996).

[4] Heubert, *Schools without rules? Charter schools, federal disability law, and the paradoxes of deregulation,* 32 Harv CR-CL L R 301, 301 (1997), quoting The White House: Hartford Debate '96—The First Presidential Debate between President Clinton and Senator Dole, part 3, M2 Presswire, October 8, 1996.

resources, what hours to operate and how best to meet students' needs.' "[5]

The "freedom" deemed necessary by charter school proponents is the flexibility achieved by relieving the schools from state or local regulation.[6] However, because legislation may not circumvent the constitution, freedom from regulation is precisely that element of the charter school concept that brings it into potential conflict with the constitution. Stated otherwise, if 1993 PA 362 "privatizes" charter schools, the fundamental constitutional value has been transgressed. Thus, unless art 8, § 2 is amended, the viability of the charter school initiative will depend on how "public" the system is under successive acts.

B

The Legislature was careful to identify charter schools as public schools for purposes of Const 1963, art 8, § 2 and as school districts for purposes of Const 1963, art 9, § 11, subsection 501(1). No doubt this was in part driven by the desire to have public school academies share in the state school-aid fund created under art 9, § 11. Organized under the Nonprofit Corporation Act, MCL 450.2101 *et seq.*; MSA 21.197(101) *et seq.*,[7] public school academies[8] are labeled government agencies with all the rights and responsibilities inherent in such an agency.[9] The power to grant academy contracts is vested in the board of any public

---

[5] *Id.*, quoting Chester E. Finn Jr., *Beating Up On Charter Schools*, New York Times, August 24, 1996, p 23.

[6] *Id.*

[7] 1993 PA 362, MCL 380.502(1); MSA 15.4502(1).

[8] Throughout the act, charter schools are referred to as public school academies. The two terms will by used synonymously in this opinion.

[9] Act 362, subsections 501(1) and 503(6).

school district, intermediate school board, board of a community college, or board of a state university. Subsection 501(2)(a). In all but the last, the public body is not to issue a contract to any charter school that would enable the school to operate outside the boundaries of the authorizing body's school district. Subsection 502(2).

Despite the illusion of public control created by the 1993 act, and the conclusion of the majority that "the public maintains control of the schools through the authorizing bodies,"[10] public school academies are controlled by privately selected, rather than publicly elected, boards of directors and are subject only to limited oversight by the authorizing bodies and the State Board of Education.

A careful reading of the 1993 act reveals that neither the authorizing body nor the State Board of Education has the power to appoint individual members to the academy board. In fact, the State Board of Education has no authority whatsoever under the statute to supervise the selection, retention, or removal of academy board members.[11] Moreover, the authorizing body's influence over the academy board of director selection process is constrained under the 1993 act so that the authorizing body only has the authority to establish the "method of selection, length

---

[10] *Ante*, p 576.

[11] The majority argues that because the State Board of Education does not have authority over the selection, retention, or removal of the members of the board of traditional public schools, then public school academies are no different from traditional public schools. Had the only defect in Act 362 been that the State Board of Education lacked authority to select, retain, or remove academy school board members, I would have joined in the majority's result. However, because of defects in Act 362 that are not so easily overlooked, I am unable to say that public school academies are "no different" from traditional public schools.

of term, and number of members of the board of directors . . . ." Subsection 503(3). Once this nebulous criteria is established, the public academy has full authority to appoint as a member of its board of directors any individual it deems fit. The academy application must describe "qualifications and method for appointment or election of members of the board," and need not disclose the actual identity of proposed board members. Subsection 502(3)(b).[12] Moreover, under the 1993 act, the authorizing body has limited recourse against the public school academy if it is dissatisfied with an individual member of the academy board. The State Board of Education has even less recourse.[13]

---

[12] While 1993 PA 362, subsection 502(3)(b) requires that the academy school application include "a list of the proposed members of the board of directors . . . *or* a description of the qualifications and method of appointment" of the members, 1994 PA 416, subsection 502(3)(b) and 1995 PA 289, subsection 502(3)(b) require that the academy school application include "a list of the proposed members of the board of directors . . . *and* a description of the qualifications and method of appointment" of board members (emphasis added). Although the Court of Appeals dissenting opinion states that the 1993 act "requires" that all initial board members be approved by the authorizing body, 216 Mich App 126, 156; 548 NW2d 909 (1996), Act 362, subsection 502(3)(b) does not so require. Therefore, it does not appear that an authorizing body would have the right to refuse an application solely because the application merely described the qualifications and method for appointment or election of members of the board of directors, rather than listing for approval the proposed members.

[13] The authorizing body's general power of recourse is limited to revoking the charter contract under § 507. The Board of Education's recourse is limited to funding revocation under the State School Aid Act, MCL 388.1601 *et seq.*; MSA 15.1919(901) *et seq.* However, the 1993 act does not expressly grant an authorizing body the right to revoke a contract if the authorizing body is dissatisfied with a member of the academy's board of directors. Instead, the authorizing body may revoke a contract for this reason only if the terms of the contract allow it to do so. Act 362, subsection 503(4)(f) and subsection 507.

The limited authority of the authorizing body and State Board of Education to oversee academy school operations is further evidenced by the process of contract issuance and revocation as provided under the 1993 act. The process by which a contract to operate a public school academy is issued is set forth in subsection 502(3). In order for a contract to be issued, it must include certain mandatory provisions[14] and may be issued only after an application has been accepted. Although the authorizing body is not required to issue a contract to any person or entity, the authorizing body, as opposed to the State Board of Education, has sole authority to approve and issue a contract.[15] In fact, no provision under the 1993 act affords the State Board of Education an opportunity to review an academy's application or contract before the contract is issued.[16]

In addition to the power to issue a contract, the authorizing body is given sole, albeit limited, authority to revoke the contract.[17] Section 507 grants the

---

[14] Act 362, subsection 503(4).

[15] Act 362, § 503. The act does include an override provision in the event the authorizing body does not issue a contract. If the authorizing body refuses to grant a contract, the proposed academy can petition the board to place the question of application on a school election ballot to be decided by the district voters. Act 362, subsection 503(2).

[16] 1994 PA 416 includes a provision requiring the authorizing body to submit a copy of the contract and application to the State Board of Education within ten days *after* the authorizing body issues a contract for a public school academy. Act 416, subsection 503(3). Even under the new legislation, the authorizing body has sole authority to revoke a contract, 1995 PA 289, subsection 507, while the State Board of Education's authority is limited to restricting the authorizing body from issuing new contracts. Act 289, subsection 502(5).

[17] The right to revoke a contract is not without its limitations. See n 13 *supra.*

authorizing body the power to revoke a contract and
provides:

> A contract issued under this part may be revoked *by the
> authorizing body* that issued the contract if the authorizing
> body determines that 1 or more of the following has
> occurred:
>     (a) Failure of the public school academy to abide by and
> meet the educational goals set forth in the contract.
>     (b) Failure of the public school academy to comply with
> all applicable law.
>     (c) Failure of the public school academy to meet gener-
> ally accepted public sector accounting principles.
>     (d) The existence of 1 or more other grounds for revoca-
> tion as specified in the contract. [Emphasis added.]

As was true of contract issuance, despite the fact that
the State Board of Education is constitutionally man-
dated to lead and supervise public education, there is
no provision under the 1993 act that grants authority
to the State Board of Education to revoke a charter
contract.

C

Lack of public control over the academy school
board of directors, and limited control of the author-
izing body and State Board of Education over the pro-
cess of contract issuance and revocation are not the
only flaws in the 1993 act. Despite the fact that public
school academies must comply with "all applicable
law,"[18] academy schools are not subject to large por-
tions of the public School Code.[19] As an example,

---

[18] Act 362, subsection 503(5).

[19] The majority asserts that it is evident that "other sections" of the
School Code apply; however, the majority remains unwilling to identify
with which sections of the School Code academy schools must comply. In

public school academies are not expressly required to use state certified teachers. Although some, including the defendants, argue that public school academies must clearly use state certified teachers, the answer to this issue is less than obvious. What is obvious is that this deficiency was corrected under 1994 PA 416 when the Legislature expressly required, in two separate provisions, that academy schools use certified teachers.[20] In addition, there is disagreement over whether public school academies must comply with core curriculum requirements. Clearly, there is no express provision in the 1993 act that requires compliance with any curriculum requirement. Rather, the act authorizes a public school academy to designate in its articles of incorporation "the educational goals

---

failing to define this issue, the majority eludes plaintiffs' assertion that public school academies are not obligated to comply with core curriculum requirements and teacher certification mandates, and leaves that issue open for future dispute. The majority's cursory conclusion that "other sections" of the School Code apply and that the School Aid Act resolves the issues discussed in this dissent does not settle the question. Instead, what is needed is specific direction with respect to which sections of the public School Code apply to public school academies. As an example, under the majority opinion, public school academies may be required to comply with the School Aid Act, but not specifically with the core curriculum requirements of the public School Code. While the School Aid Act does require compliance with the core curriculum requirements of the public School Code, MCL 388.1619; MSA 15.1919(919), failure of the school district to comply with those requirements merely means the school forfeits five percent of the total funds for which the school qualified under the School Aid Act. MCL 388.1619(3); MSA 15.1919(919)(3). Therefore, a school may lose five percent of its allotted monies, but still be entitled to the majority of its public funds. Obviously, mandating compliance with § 19 of the School Aid Act without also mandating compliance with core curriculum requirements of the public School Code might not adequately protect against public monies being used to aid or support nonpublic schools. Const 1963, art 8, § 2.

[20] Act 416, subsections 505(1) and 515(1). The private, denominational, and parochial schools act provides that a teacher must hold a certificate that would qualify the teacher to teach in a like grade of the public schools of the state. MCL 388.553; MSA 15.1923.

of the public school academy and *the curriculum to be offered* and methods of pupil assessment to be used . . . ." Act 362, subsection 502(3)(d)(*ii*) (emphasis added). Although the state's interest in establishing basic requirements to prepare citizens to participate effectively and intelligently in the political system is indisputable, *Wisconsin v Yoder*, 406 US 205, 225-226; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *People v DeJonge (After Remand)*, 442 Mich 266, 307; 501 NW2d 127 (1993), progress in achieving unspecified goals is to be assessed "[t]o the extent applicable," using several designated tests, including the Michigan Education Assessment Program test.

If failure to define the obligations of academy schools with respect to teacher certification and core curriculum requirements was the only defect in Act 362, the act might be constitutional. "A statute may be constitutional though it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements, and in this situation the court is justified in holding that the statute was intended to be subject to such requirements, and that those requirements are to be considered as embodied in the statute." 216 Mich App 126, 147; 548 NW2d 909 (1996). I am persuaded, however, that Act 362 incorporates express provisions that are inconsistent with the conclusion that academy schools must comply with the public School Code.

1993 PA 362 amended only part 6A of the public School Code. Additional sections were not amended at that time to bring the remainder of the School Code into alignment with amended part 6A. Inclusion of a limited number of provisions of the state School Code in the 1993 act, and the concomitant exclusion

or failure to include the term "public school academies" in other provisions of the code, necessarily leads to the conclusion that provisions of the School Code that fail to mention public school academies are not applicable to academy schools.

In this regard § 503 of the 1993 act is instructive. Under subsection 503(5), a public school academy must comply with "all applicable law," including but not limited to: (a) the Open Meetings Act, MCL 15.261 *et seq.*;   MSA 4.1800(11) *et seq.*,   (b) the Freedom of Information Act, MCL 15.231 *et seq.*;   MSA 4.1801(1) *et seq.*,   (c) the public employment relations act, MCL 423.201 *et seq.*;   MSA 17.455(1) *et seq.*,   (d) the prevailing wages act, MCL 408.551 *et seq.*;   MSA 17.256(1) *et seq.*,   and (e) §§ 1267 and 1274 of the School Code.[21] If requiring compliance with "all applicable law" subjected public school academies to the requirements of the entire School Code, the language requiring compliance with §§ 1267 and 1274 of the School Code would be redundant. Interpreting the statute in such a way would violate established principles of statutory construction that every word in a statute has meaning and no word should be interpreted as surplusage or rendered nugatory. *Altman v Meridian Twp*, 439 Mich 623, 635; 487 NW2d 155 (1992).   Moreover, if "all applicable law" were meant to include the whole of the School Code, subsection 513(8)(e), as amended by 1994 PA 416,   and subsection 503(6)(e), as amended by 1995 PA 289,   would also be rendered

---

[21] Sections 1267 and 1274 require school districts to obtain competitive bids when entering into construction contracts and when purchasing supplies, materials, equipment, or services where the cost of a single transaction is $12,500 or more.

meaningless.[22] Clearly, this interpretation of "all applicable law" flies in the face of traditional notions of statutory construction.

Had the Legislature wished to ensure that the entire School Code would be applicable to academy schools it would have expressly provided so. Its failure to do so leads to only one conclusion: while academy schools are bound to comply with some restrictions that are generally applicable to all public schools, such as the Freedom of Information Act, MCL 15.231; MSA 4.1801(1), academy schools have significant independence under 1993 PA 362 from state or local regulation. When coupled with private boards of directors that have limited obligations to answer to the public, and with authorizing bodies and a State Board of Education that are essentially powerless to supervise academy school organization and operation, the academy schools established by the 1993 act are private schools that have been given selected accouterments of public schools in the hope that they will be characterized as the functional equivalent of public schools. Simply put, this "innovative" act effectively grants academy schools nearly "total independence to decide what to teach and how to teach it, whom to hire and how to use their resources, what hours to operate and how best to meet students' needs."[23] In my judgment, the 1993 act is facially violative of art 8, § 2 of the Michigan Constitution.

---

[22] Subsection 513(8)(e), as amended by 1994 PA 416, requires part 6B public school academies to comply with subsection 1263(3) and §§ 1267 and 1274 of the School Code. Subsection 503(6)(e), as amended by 1995 PA 289, requires compliance with §§ 1134, 1135, 1146, 1153, subsection 1263(3), and §§ 1267 and 1274 of the School Code.

[23] Heubert, n 4 *supra* at 301.

II

Even assuming, arguendo, that public school academies are public schools under art 8, § 2 of the state constitution, I am of the opinion that 1993 PA 362 would violate Const 1963, art 8, § 3 by divesting the State Board of Education of its constitutionally mandated authority to lead and supervise all public education. Article 8, § 3 of the Michigan Constitution provides in part:

> Leadership and general supervision over all public education . . . is vested in a State Board of Education. It shall serve as the general planning and coordinating body for all public education . . . and shall advise the legislature as to the financial requirements in connection therewith.

Inasmuch as the constitution vests leadership and general supervisory authority over all public education in the State Board of Education alone, the Legislature lacks the power to diminish state board authority by statute.

For many of the same reasons that have already been discussed, the authority of the State Board of Education over public school academies has been unconstitutionally abrogated under 1993 PA 362. The paramount role of the superintendent of the State Board of Education has not only *not* been expressly acknowledged in the 1993 act, but has in actuality been limited by the terms of the act. Under 1993 PA 362, the Board of Education has no authority to review an academy application, issue a charter contract, revoke a contract for lack of compliance, oversee and approve an academy's educational goals, proposed curriculum, student assessment criteria, or length of student day. In fact, any authority to oversee

and supervise academy school activity has been vested in the authorizing body alone. The ability of the State Board of Education to lead and supervise public school academies is left to its ability to deny or revoke funding under the State School Aid Act.[24] Because the constitution grants the State Board of Education general supervisory and leadership authority over public schools, and the power to act as the general planning and coordinating body for all public education, segregation of this power to funding matters alone is a violation of the constitution.

I am persuaded that the ability of the State Board of Education to oversee and supervise public education in Michigan has been usurped by 1993 PA 362. Accordingly, I would hold that 1993 PA 362 violates art 8, § 3 of the Michigan Constitution.

III

I approach this issue with caution, being fully aware that an act of the Legislature must be presumed constitutional unless "no set of circumstances exists under which the [a]ct would be valid." *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). However, I conclude that, as written, no set of circumstances exists under Act 362 that would give authorizing bodies and the State Board of Education statutory authority to oversee and supervise charter schools sufficient to make these schools "public" for purposes of art 8, § 2 and § 3 of the Con-

---

[24] To argue that the State Board of Education has ultimate authority over public school academies because it can refuse to pay under the State School Aid Act is no more than saying that the state can refuse to pay a contract agent if it does not like the services the agent provides. This right to refuse payment is by no means "leadership" by the State Board of Education.

stitution of 1963. The fact that some public school academies may choose to go beyond the requirements of the act in operating academy schools does not validate the act itself. Therefore, I find 1993 PA 362 facially invalid, and I would affirm the Court of Appeals decision. Because I believe that the constitutionality of the 1994 and 1995 amendments, being 1994 PA 416 and 1995 PA 289, are inextricably related to the ultimate issue to be decided in this case, and because the constitutionality of those amendments was not fully briefed or argued before this Court, I would remand this case to the trial court for full briefing and argument on that issue and retain jurisdiction.

KELLY, J., took no part in the decision of this case.