# STATE OF MICHIGAN

# COURT OF APPEALS

COUNCIL OF ORGANIZATIONS AND
OTHERS FOR EDUCATION ABOUT
PAROCHIAID, AMERICAN CIVIL LIBERTIES
UNION OF MICHIGAN, MICHIGAN PARENTS
FOR SCHOOLS, 482FORWARD, MICHIGAN
ASSOCIATION OF SCHOOL BOARDS,
MICHIGAN ASSOCIATION OF SCHOOL
ADMINISTRATORS, MICHIGAN
ASSOCIATION OF INTERMEDIATE SCHOOL
ADMINISTRATORS, MICHIGAN SCHOOL
BUSINESS OFFICIALS, MICHIGAN
ASSOCIATION OF SECONDARY SCHOOL
PRINCIPALS, MIDDLE CITIES EDUCATION
ASSOCIATION, MICHIGAN ELEMENTARY
AND MIDDLE SCHOOL PRINCIPALS
ASSOCIATION, KALAMAZOO PUBLIC
SCHOOLS, and KALAMAZOO PUBLIC
SCHOOLS BOARD OF EDUCATION,

        Plaintiffs-Appellees,

v

STATE OF MICHIGAN, GOVERNOR,
DEPARTMENT OF EDUCATION, and
SUPERINTENDENT OF PUBLIC
INSTRUCTION,

        Defendants-Appellants.

FOR PUBLICATION
October 16, 2018

No. 343801
Court of Claims
LC No. 17-000068-MB

Before: MURPHY, P.J., and GLEICHER and LETICA, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

Constitutional interpretation begins with the text: the words approved by the ratifiers. The words at the heart of this case are clear, cogent, and commanding. No public money may be appropriated by the Legislature "directly or indirectly to aid or maintain" a nonpublic school. Const 1963, art 8, § 2. No public money may be provided "directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school . . . ."

-1-

*Id*. The natural and ordinary meaning of those words—today and in 1970—forbids publicly-funded financial aid payments to nonpublic schools.

MCL 388.1752b(1) allocates up to $2,500,000 from Michigan's general fund to "reimburse actual costs incurred by nonpublic schools in complying with a health, safety, or welfare requirement mandated by a law or administrative rule of this state." By passing this statute, the Legislature opened the door to direct payments to nonpublic schools intended to help those schools do business as private institutions.

The majority carves out an exception to the resoundingly clear Constitutional language forbidding direct aid. Applying a three-part test of its own making, the majority declares that payments earmarked as reimbursement for certain costs of doing business circumvent the Constitution's plain words. This holding ignores the constitutional text and imposes a judicial gloss that contradicts the people's will and the well-understood words they approved. And even if the majority's test were consistent with the Constitution, MCL 388.1752b flunks it. I respectfully dissent.

I

Soon after the people amended Article 8, § 2 of the 1963 Constitution through a voter initiative called Proposal C, the Supreme Court agreed to answer seven certified questions concerning the amendment's application. *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 403-404; 186 NW2d 9 (1971). The Supreme Court's analysis began with the words the people approved:

> No public monies or property shall be appropriated or paid or any public credit utilized, by the [L]egislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The [L]egislature may provide for the transportation of students to and from any school. [Const 1963, art 8, § 2.]

To ascertain the meaning of these words, the Court applied "the rule of 'common understanding'" described by Justice COOLEY. *Id*. at 405. The words the voters selected and approved, Justice COOLEY instructed, point the truest course to constitutional meaning. *Id*. The people "ratified the instrument in the belief" that their understanding of the words they endorsed would be enforced. *Id*., quoting Cooley's Const Lim 81 (emphasis omitted). And in its most recent case of constitutional import, the Supreme Court highlighted that " 'there is no more constitutionally significant event than when the wielders of all political power' " under the 1963 Michigan Constitution "choose to exercise their extraordinary authority to directly approve or disapprove of an amendment thereto." *Citizens Protecting Michigan's Constitution v Sec'y of State*, ___ Mich ___; ___ NW2d ___ (Docket No. 157925, decided July 31, 2018), slip op at 7,

quoting *Blank v Dep't of Corrections*, 462 Mich 103, 150; 611 NW2d 530 (2000) (MARKMAN, J., concurring).

The words added by amendment to Article 8, § 2, are easily parsed. No public money may be appropriated by the Legislature to directly or indirectly aid or maintain nonpublic schools. The amendment brooks no exceptions or tests. The "common understanding" of those words is that the public funds may not be used to help nonpublic schools stay in business.

The Supreme Court reached the same conclusion in *Traverse City Sch Dist*, 384 Mich at 410 n 2, stating that the voters understood and intended Proposal C as a constitutional prohibition of any allocation of public money "to run parochial schools." Those who voted on the proposal, both pro and con, "agreed [that] the proposed amendment was designed to halt parochiaid and would have that effect if adopted."[1] *Id.* More than two decades later, the Supreme Court reiterated that "the common understanding of the voters in 1970 was that no monies would be spent to run a parochial school." *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 583; 566 NW2d 208 (1997).

The circumstances surrounding the amendment's adoption buttress the unambiguous constitutional text. See *Traverse City Sch Dist*, 384 Mich at 405 ("A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered."). Those circumstances merit careful consideration, as they spotlight the fundamental flaws in the majority's reasoning. Although the majority largely rests its decision on *Traverse City Sch Dist*, it sidesteps the facts of that case and the Court's central holdings.

Before Proposal C passed, the Legislature had appropriated funds to nonpublic schools to pay lay teachers to teach secular subjects in nonpublic schools. *Traverse City Sch Dist*, 384 Mich at 406 n 1. The purpose of these appropriations was "clearly, plainly and unambiguously" to aid nonpublic schools in meeting the increasing costs of education. *Advisory Opinion re Constitutionality of PA 1970, No 100*, 384 Mich 82, 91; 180 NW2d 265 (1970). The appropriation of public funds to aid nonpublic schools did not sit well with the people, and Proposal C ended it. After it passed, the Supreme Court struck down as unconstitutional the appropriation statute that it had approved just a year earlier. *Id.* at 408.

Not only did passage of the amendment end direct payment of nonpublic school employee salaries; the Court specifically identified four other fundamental tenets encapsulated within Proposal C, listing all five as follows:

1. No public money "to aid or maintain" a nonpublic school;

2. No public money "to support the attendance of any student" at a nonpublic school;

---

[1] "Parochiaid" is shorthand for "direct financial aid to nonpublic schools[.]" *Snyder v Charlotte Pub Sch Dist*, 421 Mich 517, 524; 365 NW2d 151 (1984).

3.   No public money to employ any one at a nonpublic school;

4.   No public money to support the attendance of any student at any location where instruction is offered to a nonpublic school student.

5.   No public money to support the employment of any person at any location where instruction is offered to a nonpublic school student. [*Id*. at 411.]

The Court evaluated various services historically provided to nonpublic school students in the light of these five prohibitions, identifying several services that could continue despite the funding ban. In stark contrast with the statute now at issue, none of the surviving services involved the direct payment of public funds to nonpublic schools.

The details of these services delimit the reach of Proposal C and offer a window into the Supreme Court's reasoning. But rather than using the Court's analysis of those services as a guide, the majority hangs its hat on two phrases loosely derived from *Traverse City Sch Dist*: "incidental aid" and "primary function." According to the majority, direct aid payments to nonpublic schools do not offend the Constitution if they are designated as reimbursements for state health, safety, and welfare mandates, and are "(1) . . . at most, merely *incidental* to teaching and providing educational services to private school students (non-instructional in nature), (2) do[] not constitute a *primary* function or element necessary for a nonpublic school to exist, operate, and survive, and (3) do[] not involve or result in excessive religious entanglement." (Emphases in original.) The majority's novel test, however, is divorced from the text of art 8, § 2 and from the contexts in which the Supreme Court actually deployed the italicized words.

Before Proposal C passed, public schools offered various services to nonpublic school students that potentially conflicted with the amendment. The Supreme Court dubbed those services "shared time" and "auxiliary" instruction. Under certain highly specific circumstances, the Court held, the provision of shared time and auxiliary services did not contravene Proposal C. In so concluding, the Court introduced the concept of an "incidental" benefit. But the shared time and auxiliary services approved in *Traverse City Sch Dist* differ profoundly from the direct allocation of funds called for by MCL 388.1752b. Lifting a phrase or two from the Court's analysis cannot change the critical differences between the services approved in 1971 and the payments now at issue.

Unlike here, "shared time" did not encompass the appropriation of public money to "aid or maintain" a nonpublic school. Unlike here, auxiliary services did not involve an allocation of public money "to support the attendance of any student or the employment of any person" at a nonpublic school. In *Traverse City Sch Dist*, 384 Mich at 413, the Supreme Court took great pains to draw a constitutional line between services provided to nonpublic schools funded by public dollars—forbidden under Proposal C—and those offered to nonpublic school students but funded entirely through payments to *public* schools; the latter could continue because the money stayed in the public fisc and was not "paid to a private agency." A closer look at the services approved in *Traverse City Sch Dist* demonstrates their dissimilarity to the direct funding approach now ratified by the majority.

Shared time, *Traverse City Sch Dist* explained, is "an arrangement for pupils enrolled in nonpublic . . . schools to attend public schools for instruction in certain subjects." *Id*. at 411 n 3 (quotation marks and citation omitted). More concretely, shared time occurs when a "public school district makes available courses in its general curriculum to both public and nonpublic school students normally on the premises of the public school." *Id*. The Court found no constitutional fault with shared-time services if public money was used to pay public school districts to hire public school teachers to teach public school courses in public schools. The Court's rationale rested largely on "control." *Id*. at 414. Shared time conducted on public school premises "is under the complete control of the public school district," the Court observed, and any aid to nonpublic schools is "only incidental" at best. *Id*. Nor does shared time at the public school "support the attendance" of students at nonpublic schools other than in a "remotely incidental" way. *Id*.

Shared-time classes conducted on leased premises "under the authority, control and operation of the public school system," the Court opined, create no conflict with Article 8, § 2. *Traverse City Sch Dist*, 384 Mich at 415. This is so because "[p]remises occupied by lease or otherwise for public school purposes under the authority, control and operation of the public school system by public school personnel as a public school open to all eligible to attend a public school are public schools." *Id*. Accordingly, shared time offered on nonpublic school premises is acceptable only if the public school maintains "the ultimate and immediate control of the subject matter, the personnel and the premises[.]" *Id*. Further, the Court instructed, the courses must be "open to all eligible to attend a public school." *Id*. Article 8, § 2 is not offended under such circumstances, the Court explained, because the public schools wield all of the control over the courses, the teachers, and the instructional locations, and any aid to the nonpublic school is "only incidental." *Id*. at 416.

What did the Court mean by "incidental" in the shared time context? Shared time within carefully circumscribed limits did not "aid or maintain" nonpublic schools. Shared time sponsored and implemented entirely by public schools benefitted *students*, not institutions. No funds for shared time were allocated as aid to nonpublic schools, and no public money "support[ed] . . . the employment" of nonpublic school personnel. By limiting shared time to circumstances in which absolute control over every dollar was retained by public schools, the Court respected Article 8, § 2's command that no public aid enrich nonpublic school coffers, even indirectly.

The shared-time services that passed constitutional muster in *Traverse City Sch Dist* are a far cry from the direct payment of public funds to nonpublic schools approved by the majority. The Supreme Court highlighted that permissible shared-time services afford nonpublic schools only "incidental aid, if any," because nonpublic schools were not monetarily enriched. *Id*. at 414. The majority highjacks the concept of "incidental" aid or benefit and transforms it into a new exception to the Constitution's plain language. Under the majority's test, the first question is whether money given to nonpublic schools is "merely *incidental* to teaching and providing educational services to private school students." (Emphasis in original.) But the "incidental" benefit idea advanced in *Traverse City Sch Dist* had nothing to do with teaching, and everything to do with following the money. *Traverse City Sch Dist* could not be any more direct than the first "prohibition" it listed: "No public money to 'aid or maintain a nonpublic school.' " *Id*. at 411. The Court has underscored that concept repeatedly: "Proposal C was an anti-parochiaid

amendment—no public monies to run parochial schools[.]" *Id*. at 410, no 2. "[T]he common understanding of the voters in 1970 was that no monies would be spent to run a parochial school." *Council of Orgs & Others for Ed About Parochiaid, Inc*, 455 Mich at 583. "Th[e] 'anti-parochiaid' amendment prohibited the direct or indirect use of public funds to aid or maintain a nonpublic school." *Snyder*, 421 Mich at 531.

The majority's test does not engage the constitutional text or address these pronouncements. The voters understood that providing money for a private school's overhead is exactly the same thing as directly allocating aid and maintenance payments. It does not matter whether the overhead payments are intended to cover "education" or any of the myriad costs that a business must bear. Public money may not aid or maintain a nonpublic school even if the aid is 100% "incidental" to teaching, because in passing Proposal C the people meant to entirely curtail public financial support for nonpublic school operations.

The Supreme Court's discussion of "auxiliary services" doesn't aid the majority, either. As they existed in 1971, "auxiliary services" were statutorily defined as follows:

> "Whenever *the board of education of a school district* provides any of the auxiliary services specified in this section to any of its resident children in attendance in the elementary and high school grades, *it shall provide* the same auxiliary services on an equal basis to school children in attendance in the elementary and high school grades at nonpublic schools. The board of education may use state school aid funds of the district to pay for such auxiliary services. Such auxiliary services shall include health and nursing services and examinations; street crossing guards services; national defense education act testing services; speech correction services; visiting teacher services for delinquent and disturbed children; school diagnostician services for all mentally handicapped children; teacher counsellor services for physically handicapped children; teacher consultant services for mentally handicapped or emotionally disturbed children; remedial reading; and such other services as may be determined by the legislature. Such auxiliary services shall be provided in accordance with rules and regulations promulgated by the state board of education * * *." [*Traverse City Sch Dist*, 384 Mich at 417-418, quoting MCL 340.622, as enacted by 1955 PA 269, repealed by 1976 PA 451 (emphasis added).]

According to this statute, "auxiliary services" were provided by the board of education of a school district to public school students. If a board offered the services to public school pupils, the *board* ("it") had to allow nonpublic school students to partake in those services. The Supreme Court described the auxiliary services called for in MCL 340.622 as "special educational services designed to remedy physical and mental deficiencies of school children and provide for their physical health and safety. Functionally, they are general health and safety measures." *Traverse City Sch Dist*, 384 Mich at 418-419.

Proposal C had "no impact" on auxiliary services, the Court held, as they were only "incidental" to the instruction of private school children. *Id*. at 419. "Consequently," the Court highlighted, "the prohibitions of Proposal C *which are keyed into prohibiting the passage of public funds into private school hands for purposes of running the private school operation* are

not applicable to auxiliary services which only incidentally involve the operation of educating private school children." *Id*. at 419-420 (emphasis added). The Court buttressed its analysis by returning to the question of control, likening auxiliary services to shared-time instruction, "in that private schools exercise no control over them. They are performed by public employees under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school." *Id*. at 420. The "auxiliary services" approved by the Supreme Court in *Traverse City Sch Dist* did not violate the Constitution because no public money flowed "into private school hands for the purposes of running the private school operation" and the "aid" at the center of the Supreme Court's analysis benefitted students with special needs rather than the schools they otherwise attended.

The Supreme Court concluded its analysis of auxiliary services with a prescient circumscription of its meaning. "[A]uxiliary services," it declared, are "limited to those . . . enumerated in the auxiliary services act." *Id*. Although the act allowed the Legislature to add services to those listed in the statute, the Court warned that this clause "does not give the [L]egislature a blank check to make any service a health and safety measure outside the reach of Proposal C simply by calling it an auxiliary service." *Id*.

II

The "primary function" aspect of the majority's new test also lacks precedential support. This phrase purportedly derives from the Supreme Court's 1975 analysis of the constitutionality of a statute requiring public school districts to purchase and loan textbooks and purchase supplies for all children of school age, including those enrolled in nonpublic schools. *Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich 41, 51; 228 NW2d 772 (1975). The Court looked to *Traverse City Sch Dist* for guidance, distilling a distinction between services "properly classified as 'incidental' to a private school's establishment and existence" and programs forming " 'primary' elements necessary for the school's survival as an educational institution." *Id*. at 48-49. The Court explained that the services permitted in *Traverse City Sch Dist* were "useful only to an otherwise viable school and are not the type of services that flout the intent of the electorate expressed through Proposal C." *Id*. Funding the costs of textbooks and supplies essentially subsidized private school operations, the Court held, as they "are essential aids that constitute a 'primary' feature of the educational process and a 'primary' element required for any school to exist." *Id*.

According to the majority, allocating public funds to nonpublic schools to cover the costs of criminal background checks, maintaining epinephrine injectors, and disposing of instruments containing mercury, all mandated by state law, is permissible because these tasks "do[] not constitute a primary function or element necessary for a nonpublic school's existence, operation, and survival[.]" The majority's strained reasoning illustrates the infirmities of its test. Criminal background checks of school personnel (public and private) are a safety measure mandated by state law. Because they are a mandate, they are by definition a primary element necessary for a school's operation. Nor can I agree that criminal background checks are merely "incidental" to providing educational services. A school may not employ a teacher who has been convicted of a listed sex offense, as a teacher convicted of a listed sexual crime is not legally qualified to teach Michigan children. See MCL 380.1230(9). Employing legally qualified teachers is a primary

-7-

function of a school.  I cannot agree that criminal background check costs are either "incidental" to a school's existence, or fall outside a school's primary function.[2]

But I see no reason for the majority's test, or any test.  We are not free to engraft special language on constitutional text that needs no such clarification.   The Supreme Court has repeatedly reinforced that the pertinent language in Article 8, § 2 means "no monies [may] be spent to run a parochial school." *Council of Orgs & Others for Ed About Parochiad*, 455 Mich at 583.  The ratifiers intended that the amendment would "halt parochiaid." *Traverse City Sch Dist*, 384 Mich at 410 n 2.  The words themselves ban direct aid to nonpublic schools regardless of the beneficence of its intentions, and the majority has not explained how its textual dodging and weaving is nevertheless consistent with the amendment's words.

The threshold inquiries in this case *should* be: does the reimbursement of state mandates constitute direct or indirect aid to a nonpublic school?  Is the reimbursement of state mandates with public funds a "payment," "subsidy" or "grant" of public money "to support the attendance" of a student or "the employment of any person" at a nonpublic school?  The answers to these questions are yes.  A direct payment to a nonpublic school intended to offset the costs of doing business is aid, a payment, a subsidy, and a grant.  The public money directly and indirectly assists nonpublic schools in keeping their doors open and meeting their payroll.   It is unconstitutional for that simple reason.

III

Measured against the Constitution's plain language and the caselaw backdrop, MCL 388.1752b cannot be sustained.  The public funds appropriated by the statute are paid directly to nonpublic schools.  Garbing the appropriation in "health, safety and welfare" dress does not change its fundamental character.  The money is intended to help nonpublic schools cover the overhead costs that result from adherence to governmental mandates.  Assisting nonpublic schools in this fashion is precisely what the voters sought to outlaw by passing Proposal C.

Nor can I accept the majority's premise that *Traverse City Sch Dist* and its progeny interpreted Article 8, § 2 to prohibit only expenditures that directly aid a nonpublic school's "educational programs."   The majority ignores the statute's pronouncement that the "[f]unds appropriated under this section are for purposes related to education[.]"  MCL 388.1752b(7).  Putting that aside, whether a cost borne by a nonpublic school is "educational" or in the nature of

---

[2] Nor are the other mandates accurately characterized as "incidental" as that term was used in *Traverse City Sch Dist*. Shared time and auxiliary services were approved because providing those services to nonpublic school students did not directly or indirectly aid or maintain nonpublic schools. The assistance provided by the services was to *students* and was at most "only incidental" to the operation of the nonpublic schools. All schools must comply with health and safety mandates, and all must spend money to do so. The point of Proposal C is that the ratifiers did not want to subsidize private schools for the costs that the people were already paying for to keep public schools open.

overhead, the underlying principal remains the same: the Legislature may not appropriate funds to offset costs if doing so directly or indirectly "aids or maintains" the nonpublic school.[3]

In addition to violating Article 8, § 2's direct/indirect aid clause, MCL 388.1752b fatally collides with the clause prohibiting the Legislature from providing any "payment" or "subsidy" that directly or indirectly "support[s] . . . the employment of any person" at a nonpublic school. The majority holds that reimbursing the "actual wages" of those nonpublic school employees for work in satisfying governmental mandates does not run afoul of the Constitution because "the tasks performed are for the health, safety, and welfare of schoolchildren and are merely incidental to providing educational services to the students; the tasks are noninstructional in nature." I am unpersuaded.

Any way I look at the statute's definition of "actual costs," it is impossible to avoid concluding that in enacting MCL 388.1752b, the Legislature created a mechanism for direct wage reimbursement. That the reimbursement is well intentioned does not transfigure a transfer of funds intended to reimburse wages into something other than a transfer of funds intended to reimburse wages. It is equally impossible to ignore that this mechanism conflicts with the clause in Article 8, § 2 forbidding any subsidies that support employment at a nonpublic school. The electors who ratified Article 8, § 2 apparently anticipated efforts to support the employment of nonpublic school workers, and approved language plainly prohibiting it. Here, the financial support appropriated for nonpublic schools is direct; reimbursing wages is the same thing as paying money to support employment, and is constitutionally prohibited.

MCL 388.1752b is irreconcilably inconsistent with Const 1963, art 8, § 2, and I would affirm the Court of Claims.[4]

/s/ Elizabeth L. Gleicher

---

[3] The amendment's text supplies another basis for rejecting the majority's distinction between "education"-related costs and other expenses involved in operating a school. The last sentence of Article 8, § 2, states: "The legislature may provide for the transportation of students to and from any school." Transportation is not an education function. If the ratifiers intended that the amendment's aid prohibitions encompassed only purely "educational" expenses, why was the transportation sentence included? If, as the majority contends, the balance of the text covered only "educational" costs, the transportation sentence would have been unnecessary. I submit that the best answer to my question is that the ratifiers sought to forbid *all* aid, direct or indirect, "educational" or otherwise, and carved out a single exception: transportation.

[4] I am in full agreement with the majority's analysis of the standing issue, as MCL 600.2041(3) indisputably affords plaintiffs with standing in this case.